COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR PART SAN JUAN

| | |
|---|---|
| LUIS R. MALDONADO VAILLANT AND VICKY RODRIGUEZ TORRES, | CIVIL NO.: KPE2008-0872 |
| Plaintiffs, | Re: ALLEGED WRONGFUL DISMISSAL, DISCRIMINATION and DAMAGES |
| V | |
| EUROBANK, | |
| Defendant. | |

## MOTION FOR SUMMARY JUDGMENT

"The mechanism of summary judgment constitutes an important tool which allows the judges to clean house of frivolities and decongest the judicial calendars. [..][Applies] even in cases in which subjective elements of motive or intention are required, there proceeds to issue summary judgment when the petitioner rests only on conclusive allegations, improbable inferences and unsustained speculations. We must remember that this procedural mechanism adequately ensures the balance between the right of all litigants to have their day in court and the just, quick and economic disposition of civil litigations." Ramos v Univision, 2010 TSPR 15.

**TO THE HONORABLE COURT:**

COMES NOW defendant, EUROBANK, INC. (hereinafter "Eurobank" and/or the "Institution" and/or the "defendant"), through the undersigned legal representation and very respectfully states, alleges and prays as follows:

**I.     INTRODUCTION**

Co-plaintiff, Luis Maldonado Vaillant (hereinafter "Maldonado" or "co-plaintiff"), worked for Eurobank between March 12, 2001 until January 11, 2008. The last position he held was *Assistant Vice President of Operations for the Lease Division*. As such, he was responsible for the operations of the Client Services Department, among others, and had personnel under his responsibility.

During his employment, Maldonado did not adequately exercise his supervisory duties towards his subordinates, particularly towards Mr. Isaac Fernandez (Supervisor of the Client Services Department) and Mrs. Rosa Calo (employee of the Client Services Department).   This situation provoked that personnel of lower hierarchy and under Maldonado's direct supervision, incurred in practices contrary to the standards of the institution, by charging the Bank clients inappropriate charges for "double penalty" when they cancelled their lease balances.  This conduct was contrary to the standards of the institution and to the contracts signed by Eurobank with the clients.  Maldonado knew of this practice by the personnel under his charge and despite that in December 2006 he instructed Fernandez to discontinue the same, he did not adequately exercise his supervisory duty to ensure that it did not continue.

**The lack of adequate supervision, by plaintiff, over his subordinates, provoked that the institution suffer economic losses totaling $125,261.82, since an employee of the entity established an illegal scheme and appropriated the reimbursements which corresponded to the clients who had been charged the double penalty or who were reimbursed the interest paid in excess or other amounts**.  Before this situation, on or about the month

of September 2007, the company started an investigation in which Maldonado was interviewed. Upon being interviewed by the auditor, Juan R. Calderon, Maldonado denied knowing that a double penalty was being charged by personnel under his charge, and indicated that he was learning about it from the auditor's own statements. Evidently, Maldonado **lied** to the auditor, since he later produced several communications to his subordinates. Among these, one addressed to Mr. Isaac Fernandez, to Mrs. Rosa Calo and others, by which he instructed how to compute the cancellation balances and thereafter another communication of December 2006 prepared by Maldonado and addressed to Mr. Isaac Fernandez indicating that the collection of a double penalty was inappropriate. This confirms that Maldonado knew about that practice since December 2006 and did not exercise the adequate supervision to stop it.

After the communication of December 2006 and having detected the fraud occurred, on September 27, 2007, Maldonado sent another communication addressed to the personnel of the Client Service Department, including Mr. Isaac Fernandez and Mrs. Rosa Calo, in which he indicated that effective immediately the cancellation balances could not be inflated with a double penalty or other charges not applicable. **Then, after the conclusion of the investigation, Eurobank decided to dismiss the employees involved who knew about the collection of the inappropriate charges. These were: Mrs. Rosa Calo, Mr. Isaac Fernandez and Maldonado. The latter was dismissed due to his lack of diligence and supervision, which contributed to the**

3

**creation of the fraudulent scheme which culminated with an economic loss
to Eurobank.**

This then, the lack of plaintiff's adequate supervision and his neglect,
provoked that this situation not be timely corrected nor that effective and
immediate measures could be taken to prevent these vents. It is evident that
plaintiff failed his duties, showing negligence, ineptitude and inefficiency in his
work, and by so doing, he acted against the best interests of the institution.

Plaintiff's conduct configured violations of the Standards Manual and Code
of Ethics of the institution. It also, configured violations to the Procedure of
Cancellation Balances or Refinancing. Without any doubt the seriousness of the
faults incurred by plaintiff entail the immediate dismissal and would have been
rash of the company to wait for the recurrence of said conduct to take corrective
action. **Pursuant to the level of seriousness of his fault, on January 11,
2008, Eurobank dismissed Maldonado**.

Then, on March 10, 2008, plaintiff served Eurobank with copy of the
Complaint. He alleged that his dismissal was wrongful and discriminatory by
reason of age. He requested the remedy provided in Act No. 80 of M ay 30,
1976, as amended (Act No. 80) (29 L.P.R.A. §185 a *et seq*.), a double indemnity
in damages under Act No. 100 of June 30, 1959, and an amount in damages for
his wife under Article 1802 of the Civil Code of Puerto Rico, in addition to the
costs and attorneys fees.

On March 28, 2008, Eurobank answers the Complaint. In general term, it
denied plaintiff's allegations and presented, among other affirmative defenses

4

that:  (1)  Maldonado was recruited in the year 2001, when he was 60 years old; (2) that Eurobank never discriminated against him and (3) **that his dismissal was fully justified because he did not adequately exercise his supervisory duties**.

Eurobank has made certain discovery to explore the grounds on which plaintiff sustains its allegations. As part of it, it took his deposition.  Therefore, Eurobank presents this motion based on the information obtained in discovery and  especially  **on Maldonado's admissions during the taking of his deposition, which are deemed true for the sole purpose of this motion**.

Below we express the facts and legal grounds which support the summary dismissal of this claim.

## II.    MATERIAL FACTS NOT IN CONTROVERSY

### A.    FACTS RELATED TO THE WRONGFUL DISMISSAL CLAIM

1.    Eurobank  is  a  financial  institution  which  has  several operational divisions, among these, Eurolease, in charge of motor  vehicle  and  equipment  leasing.    **See  Sworn Statement of Mrs. Aida Mendez – Exhibit 1**.

2.    Eurobank has an *Associates Manual* which contains the standards and policies of the company, among these those which  prohibit  discrimination  and  establish  a  complaint mechanism.    **See  Exhibit  2  –  Plaintiff's  Deposition,  at pages 29-30 (hereinafter "Deposition").**  Said manual is

delivered to all the employees.  **See Sworn Statement of Mrs. Aida Mendez – Exhibit 1**.

3.  **On March 12, 2001**, Maldonado started as employee of Eurobank.  **See Stipulation of Uncontroverted Facts of the Pre-Trial Conference Report (hereinafter "Stipulation No.), Stipulation No. 2**.

4.  On that same date, Maldonado received a copy of the Associates Manual and Rules of Conduct of the Institution. **See Stipulation No. 4**.

5.  Through the years, Maldonado received copy of the amendments to the policies and rules of the company.  **See Stipulation No. 5.**

6.  On June 9, 2001, Maldonado became a regular employee in the position of Operations Officer in the Lease Department. **See Stipulation No. 6.**

7.  As Operations Officer, Maldonado was in charge of the sales area operations, licenses (sale of license renewal tags and vehicle registries) and quality control, and in charge of over 22 persons. **See Stipulation No. 7.**

8.  In the month of May 2006, Maldonado passed on to the position of Operations Manager.  **See Stipulation No. 8.**

9.  As Operations Manager, Maldonado maintained the same duties and responsibilities. **See Stipulation No. 9.**

10.    Maldonado directly supervised Mr. Isaac Fernandez, who was the Supervisor of the Client Services Department and he, in turn, a group of employees. **See Stipulation No. 10.**

11.    Among the employees supervised by Mr. Fernandez, was Mrs. Rosa Calo, who worked as Customer Service Officer, Clerk. **See Exhibit 2 – Plaintiff's Deposition, at pages 21, 90** (hereinafter "Deposition").

12.    On **July 11, 2007**, Maldonado passed to the position of *Assistant Vice President Operations Manager*. **See Stipulation No. 11.**

13.    As part of his functions, Maldonado supervised Mr. Isaac Fernandez and the personnel of the Client Services Department. **See Stipulation No. 12.**

14.    The Client Services Department of Eurobank is the one that determines the balances pending at the time the client cancels its lease contract. **See Exhibit 2 – Plaintiff's Deposition, at page 98.** that is, it was that Department that determined what amount the client had to pay and/or which had t be reimbursed to the client. **Id.**

15.    On **July 8, 2005**, Maldonado sent an e-mail to Mr. Isaac Fernandez, to Mrs. Rosa Calo and to other employees of the Client Services Department which included the procedure of

cancelation balances or refinancing.  **See Stipulation No. 13**.

16.     Specifically said e-mail message, mentioned the procedure to be followed in the cancellation balances.  **See Exhibit 2 – Plaintiff's Deposition, at page 102.**

17.     It also indicated that the penalty for cancelling is a rent or 5% of the net payoff, whichever is less.  **See Exhibit 2 – Plaintiff's Deposition, at page 102;  see also, Deposition at page 61.**  That was the only penalty that  the Bank was authorized to charge.  **Id. at page 103**.

18.     On or about the month of **December 2006**, due to an approach made by an Accounts Executive of the Institution, Maldonado learned that the Client Services Department was charging a "**double penalty"** to its clients in the cancellation balances of the portfolio corresponding to another Bank.  **See Exhibit 2 – Plaintiff's Deposition, at pages 63, 103- 104.**     The Client Service area was appointed to the operations Area directed by Maldonado.  **See Stipulation No. 15.**

19.     Said "double penalty" charged to the clients was not contemplated in the lease contract which the client had signed.  **See Exhibit 2 – Plaintiff's Deposition, at page 63. That is, it was against the terms of the lease contract. Id.**

20. On **December 9, 2006**, Maldonado sent Mr. Isaac Fernandez an e-mail instructing him to immediately eliminate the "double penalty in the cancellation balances of the portfolio corresponding to another bank." **See Stipulation No. 14.**

21. **Maldonado did not take any disciplinary action against Mr. Isaac Fernandez for the collection of said "double penalty." See Exhibit 2 – Plaintiff's Deposition, at page 73.** This, despite that Maldonado knew that Mr. Isaac Fernandez's act was contrary to the lease contract and company proceedings. Id.

22. After the e-mail send in December 2006, Maldonado does not recall if he verified with Mr. Isaac Fernandez that he was complying with the guidelines given in that communication. **See Exhibit 2 – Plaintiff's Deposition, at pages 73, 77.**

23. Maldonado Never talked to his supervisor, Mr. Jaime Noble, about the collection of the "double penalty" being made to the clients. **See Exhibit 2 – Plaintiff's Deposition, at pages 75, 79-80.**

24. Then, on or about September 2007, Eurobank started an investigation regarding the matter of the "double penalties" being charged to the clients of Eurobank. **See Exhibit 3 – Sworn Statement of Mr. Juan R. Calderon, General**

9

Auditor; see also, **Report of September 29, 2007 prepared by Mr. Angel F. Cotto, AVP Director of Security; and Memorandum of October 12, 2007 prepared by Mr. Luis Virella, Audit Manager**.

25. As part of said investigation, Eurobank interviewed co-defendant Maldonado. **See Exhibit 3 – Sworn Statement of Mr. Juan R. Calderon, General Auditor.**

26. Upon being interviewed by Eurobank, Maldonado denied knowing that the "double penalty" was being charged by personnel under his charge and indicated that his first knowledge was obtained by that expressed by the auditor himself. **See Exhibit 3 – Sworn Statement of Mr. Juan R. Calderon, General Auditor.**

27. Days after being interviewed, and in a clear contradiction with his testimony during the investigation, Maldonado submitted copy of the e-mail he send in the month of December 2006 asking his subordinates to stop the practice of the collection of the "double penalty." **See Exhibit 3 – Sworn Statement of Mr. Juan R. Calderon, General Auditor.**

28. On **September 21, 2007**, Maldonado sent to Mr. Isaac Fernandez, Rosa Calo and other employees of the Client Services Department an e-mail indicating that "effective

immediately the cancellation balances '**CANNOT BE INFLATED BY DOUBLE PENALTY OR INAPPROPRIATE CHARGES.'**" Violating these instructions may be cause for disciplinary actions. (Emphasis on original). **See Stipulation No. 16.**

29. In the chain of command, Mr. Isaac Fernandez was responsible for the performance of Mrs. Rosa Calo, and Maldonado, in turn was responsible for the performance of Mr. Isaac Fernandez and Mrs. Rosa Calo. **See Stipulation No. 17.**

30. The investigation reflected that Mrs. Rosa Calo appropriated part of the money of the "double penalty" which was being unduly charged. **See Exhibit 3 – Sworn Statement of Mr. Juan R. Calderon; see also See Exhibit 2 – Deposition, at pages 58, 79, 105.** The total amount of money collected as "double penalty" totaled approximately $115,000.00. **Id.**

31. **Maldonado was dismissed on January 11, 2008. See Stipulation No. 19.**

32. At the time of his dismissal, Mrs. Aida Mendez informed him that he was being dismissed due to his inefficiency in his supervisory functions. **See Stipulation No. 20.**

33. the company also dismissed Mr. Isaac Fernandez and Mrs. Rosa Calo. **See Stipulation No. 21.**

34.  **Maldonado knows that his dismissal was related to the situation incurred by Mrs. Rosa Calo.  See Exhibit 2 – Deposition, at pages 58, 90.**

35.  Maldonado does not know who made the decision to dismiss him from Eurobank.  **See Exhibit 2 – Plaintiff's Deposition, at page 85.**

**B.    FACTS RELATED TO THE AGE DISCRIMINATION CLAIM**

36.  Maldonado was born on January 28, 1941.  **See Stipulation No. 21.**

37.  When Maldonado started to work for Eurobank he was **60 years old.  See Stipulation No. 2.**

38.  **Maldonado was recruited by Mr. Jaime Noble, who was his immediate supervisor.**  Mr. Jaime Noble was born on February 5, 1951.  **See Stipulation No. 3.**

39.  **During his employment with Eurobank, Maldonado never presented any complaint for discrimination in employment.  See Stipulation No. 18.**

40.  When Maldonado was dismissed from Eurobank he was 66 years old.  **See Stipulations No. 1 and 21.**

41.  Maldonado sustains that his dismissal was discriminatory by reason of age due to certain remarks made to him <u>between the years 2006 and 2007</u>, two Account Executives of Eurobank, and a representative of a dealer who was not an

employee of Eurobank. Maldonado also sustains that his dismissal was discriminatory by reason of age due to certain remarks made by a representative of a car dealer who was not an employee of Eurobank.

## B.1 ALLEGED REMARKS OF TWO ACCOUNT EXECUTIVES OF EUROBANK

42. Between the years 2006 and 2007, two Account Executives of Eurobank, **who were in a lower hierarchal position than Maldonado**, made some alleged comments regarding his age. **See Exhibit 2 – Deposition, at pages 35-36, 43.**

43. Maldonado would tell the two Account Executives of Eurobank to "stop that joke.2 **See Exhibit 2 – Deposition, at page 37.**

44. At times, Maldonado exchanged jokes with both Account Executives. **See Exhibit 2 – Deposition, at page 39.**

45. Despite that he was in a higher hierarchal position than the two Account Executives, Maldonado did not discipline them; nor did he take any later action against them, nor did he report them to their immediate supervisor. **See Exhibit 2 – Deposition, at pages 38-39.**

## B.2 ALLEGED REMARKS OF THE REPRESENTATIVE OF THE DEALER WHO DID BUSINESS WITH EUROBANK.

46.    Between the years 2006 and 2007, a representative of the dealer JM Auto Group, told Maldonado "I am here so that this old man solves these two cases I have for disbursement." **See Exhibit 2 – Deposition, at pages 44-45.**

47.    Maldonado does not recall if he told the representative of the dealer that he did not like the remark. **See Exhibit 2 – Deposition, at page 54.**

48.    Maldonado does not recall if he told anyone in Eurobank about the remark made by the dealer representative. **See Exhibit 2 – Deposition, at page 54.**

49.    **Maldonado did not mention this situation with the dealer representative to his immediate supervisor, Mr. Jaime Noble. See Exhibit 2 – Deposition, at page 54.**

50.    Maldonado did not mention this situation with the dealer representative to the Human Resources Department of Eurobank. **See Exhibit 2 – Deposition, at page 54.**

51.    Maldonado did not ask Eurobank that another person of the company to take care of the dealer representative. **See Exhibit 2 – Deposition, at page 54.**

52.    Maldonado sustains that his dismissal was discriminatory by reason of age due to the remarks made between the years 2006 and 2007 by the two Account Executives of Eurobank

and the dealer representative who did business with Eurobank. **See Exhibit 2 – Deposition, at pages 55, 57.**

**B.3    ALLEGED REMARKS OF MR. JAIME NOBLE**

53.    Between the end of 2007 and beginning of 2008, in two or three official meetings, Mr. Jaime Noble asked some questions to Maldonado about his retirement from the company. **See Exhibit 2 – Deposition, at page 25.**

54.    Said conversations occurred only between Mr. Noble and Maldonado. **See Exhibit 2 – Deposition, at pages 25 and 26.** There was no one else present. **Id.** There was a relationship of confidence between them. **See Exhibit 2 – Deposition, at page 27.**

55.    **Maldonado never told Mr. Noble that these questions bothered him. See Exhibit 2 – Deposition, at page 28.**

56.    On March 6, 2008, Maldonado filed his complaint for wrongful dismissal and age discrimination against Eurobank. **See Exhibit 2 – Deposition, at page 87.**

**III.    ARGUMENTS AND APPLICABLE LAW**

**A.    EUROBANK WRONGFULLY DISMISSED PLAINTIFF**

At the start, this Honorable Court must analyze whether the conduct incurred by co-plaintiff Maldonado was sufficiently negligent and careless as to entail his dismissal. For this, this Honorable Court must consider: (1) what was Maldonado's position and its importance within the company; (2)

what where his duties in that position; (3) if there existed a standard which prohibited the conduct for which he was sanctioned; (4) if the mentioned conduct violating the standards was negligent and/or serious; (5) whether it affected the good operation of Eurobank; and (6) if the sanction imposed was applied uniformly. Before these circumstances, this Honorable Court must consider that plaintiff's dismissal was justified.

It must be emphasized that in Puerto Rico there is no prohibition *per se* against the dismissal. *Arroyo v Rattan Specialties, Inc.*, 117 D.P.R. 35, 65 (1986); *Santiago v Kodak Caribbean*, 129 D.P.R. 49 (1992). The employer does not have the duty to not dismiss its employees. **Act No. 80 of May 30, 1976, 29 L.P.R.A. Secs. 185a *et seq*. (hereinafter "Act No. 80"), does not prohibit dismissal, it only establishes a presumption of wrongful dismissal, which is <u>defeated</u> when the employer show that the decision was not arbitrary or capricious and that it was related to the good and normal operation of the company**.

**As is known, the negligence, incompetence, disloyalty and disobediences to the rules and orders of the employer, are justified reasons to dismiss an employee**. *Mercedes Bus Line v Tribunal de Distrito,* 70 D.P.R. 690, 695 (1949). On this particular in *Blanes v Tribunal de Distrito*, 69 D.P.R. 113, 120 (1948), our Supreme Court stated:

> "In all employment contract, there exists, expressly or implicitly the condition that the employee shall comply the duties of its employment competently and consequently **if it is shown that the employee is incompetent, inefficient or negligent, in such manner that to continue with his services would**

16

>   **result prejudicial to the employer, and even third
>   parties, this fact constitutes just cause for the
>   dismissal."**

However, Act No. 80, *supra*, does not exclude from sanction or dismissal in the first and only offense that fault the intensity of which thus requires it to protect the security or the efficiency which constitute the normal operation of the establishment. *Delgado Zayas v Hosp. Int. Med. Avanzada*, 137 D.P.R. 643, 650 (1994);  **In turn, it has been recognized that a single offense or first fault constitutes just cause for dismissal, if due to its seriousness and potential of damage puts at risk the order, the security or the efficiency which constitute the normal operation of the company.  It is required that said fault be of such seriousness or nature that it reveals an attitude or a detail of the nature of the employee, so harmful to the peace and good order of the company, that it would be an imprudence to awaits is recurrence to separate it from the establishment**.  *Secretario del Trabajo v I.T.T., supra*. What is essential is that the intensity of the damage perpetrated by the employee, manifests a condition which within the context of the employment is unacceptable or intolerable to the employer, regardless that it concerns an isolated act. See *Torres Solano v P.R.T.C.*, 127 D.P.R. 499 (1990) (physical aggression); *Autoridad de Edificios Publicos v Union Independiente*, 130 DPR 983 (1992), (lie on an employment application);  *Srio del Trabajo v G.P. Inds., Inc.*, 153 D.P.R. 223 (2001) (adulterous relationship in the workplace).

   **In the present case it is uncontroverted that Maldonado as Assistant Vice President Operations Manager did not adequately exercise his**

17

**supervisory duties towards his subordinates.  See Uncontroverted Material Facts Numbers 18, 19, 29 and 30.**

Maldonado knew the procedure that had to be followed in the cancellation balances and knew the consequences for following the same.  **See Uncontroverted Material Facts Numbers 1, 2, 4, 5, 7, 15, 16 and 28 ("the cancellation balances CANNOT BE INFLATED FOR DOUBLE PENALTY OR WHICH DO NOT PROCEED...violating these instructions may be cause for disciplinary actions.").**  Likewise, Maldonado was aware that one of his subordinates was charging a "double penalty" in the cancellation balances.  **See Uncontroverted Material Facts Numbers 18, 20, 25, 27, and 28.**  Maldonado was also aware that the collection of a "double penalty" was not contemplated in the lease contracts executed with the clients.  **See Uncontroverted Material Facts Number 19.**  Despite that he knew his subordinates were illegally and unlawfully collection a "double penalty,"   Maldonado does not recall if he followed-up his employees so that they did collect the "double penalty"; and never talked to his immediate supervisor, Mr. Jaime Noble, about the collection of the "double penalty."  **See Uncontroverted Material Facts Numbers 22 and 23.**  The lack of adequate supervision by plaintiff over his subordinates, provoked that the institution suffer economic losses totaling $155,453.34, due to his lack of diligence.  **See Uncontroverted Material Facts Number 30.**  Said lack of adequate supervision of plaintiff and his carelessness provoked that this situation was not timely corrected or that effective and immediate measures could be adopted to prevent these events.  It is evident that plaintiff failed his duties,

showing negligence, ineptitude and inefficiency in his work, and by doing so he acted against the best interests of the institution. That is precisely what Mrs. Aida Mendez, Director of Human Resources of Eurobank informed him at the time of dismissing him. **See Uncontroverted Material Facts Number 32.**

Worse still, during the investigation performed by Eurobank on the collection of said "double penalty," Maldonado lied and told the auditor he did not know that a "double penalty" was being charged and that he was first learning of this by what the mentioned auditor stated. **See Uncontroverted Material Facts Number 26.** This, despite that since the month of December 2006, Maldonado had already sent an e-mail message to Mr. Isaac Fernandez to immediately eliminate the collection of the mentioned "double penalty." **See Uncontroverted Material Facts Number 20.** Hence, before the dilemma Maldonado's was in (admit he was negligent by not adequately following-up and supervising his subordinate), Maldonado freely and voluntarily opted to lie and not cooperate with an investigation of theft of the Bank, which also constituted a serious violation of the standards and policies of Eurobank. **See Uncontroverted Material Facts Number 26.**

Evidently, during the investigation, plaintiff hid information essential to the institution, which is contrary to the standards of the company and his duties as employee and was dishonest. The lack of honesty and lie, are justified reasons for a dismissal. *Autoridad de Edificios Publicos v Union Independiente*, 130 DPR 983 (1992). Also in *Ayala v Hospital San Pablo*, 2007 TSPR 62, upon

conforming the dismissal due to the theft of a case of beer, the Supreme Court
stated:

> "If well it is true that a person may at a given moment
> be determined to be more or less intoxicated,
> depending on the number of drinks ingested, **a
> person cannot be more or less honest**.   This
> because honesty is an inherent characteristic of the
> human being.  **IN OTHER WORDS, ONE IS HONEST
> OR NOT.  This does not depend on the number of
> objects stolen nor on their value."** <u>Ayala v Hospital
> San Pablo</u>, 2007 TSPR 62, Concurring Opinion of
> Associate Justice, Mr. Rebollo Lopez.

**In turn the communication confirms that since prior to December
2006, plaintiff knew about the irregularities which the personnel under his
charge were committing and did not take adequate, effective and
immediate measures to avoid this situation, which later resulted damaging
to the institution and its clients**.  Note the Honorable Court that due to the
market in which Eurobank operates and due to the nature of its operations,
Eurobank not only needs persons capable of efficiently performing their duties,
but persons it can trust.  **See Uncontroverted Material Facts Number 1.**  To
required Eurobank to wait for plaintiff to once again show these damaging
characteristics would have been not only a mere imprudence, but would militate
against good banking and human recourse practices of a company.  Due to this,
Eurobank was left no other alternative than to dismiss Maldonado.  **See
Uncontroverted Material Facts Number 31.**

**It is obvious that Maldonado was negligent in exercising the
supervisory functions of his position and showed such ineptitude and
inefficiency, that he allowed the fraudulent conduct  by his subordinates,**

**prejudicial to the institution and its clients.** If well it is true that labor legislation addresses protecting the interest of the workers, said provisions <u>cannot be used to endorse conduct which is detrimental to the interests, not only of the employer</u>, but the security and people in general.

**It is due to this that it has been established that the incompetence of an employee constitutes just cause for its dismissal.** *Aguayo v R.J. Reynolds Tobacco Co.,* 670 F. Supp. 1094 (1987); the same as showing negligence, ineptitude, inefficiency, fraud, serious disloyalty and dishonesty in its work. *Belk v Martinez*, 146 D.P.R. 215 (1998). The uncontroverted facts clearly show that Maldonado's negligent conduct affected the order, the security in the transactions and the normal and good operation of the business, so that the dismissal of this employee was justified.

Finally, Eurobank uniformly applied its standards and regulations. In these circumstances the institution dismissed other employees as a result of these deviations. **See Uncontroverted Material Facts Number 33.** These were Mr. Isaac Fernandez and Mrs. Rosa Calo, both subordinates of plaintiff. **See Uncontroverted Material Facts Numbers 10, 11, 13, 29, 30.** That is, all those responsible for this situation being created were dismissed, so that the standards were applied uniformly.

In short, plaintiff's conduct configured violations to the Standards Manual and Ethics Code of the institution. **The seriousness of the faults incurred by plaintiff entail dismissal and it would have been imprudence on the part of the company to await the recurrence of said conduct to take corrective**

action. **In these circumstances, the plaintiff's dismissal was not arbitrary nor capricious, but was related to the good and normal operation of the company.** All of acts of the defendant towards plaintiff were for legitimate, justified. non-discriminatory reasons, due to which the Complaint must be dismissed.

Ultimately, the management prerogative grants the employer the faculty to take the legitimate administrative measures it deems necessary for the sound administration of its business. *Guía revisada para la interpretación y aplicación de la Ley Núm. 80, supra*, at page 39.

## B. THERE WAS NO ATTITUDE OF DISCRIMINATION BY EUROBANK IN PLAINTIFF'S DISMISSAL

Secondly, plaintiff alleges that it was dismissed from his employment due to his age, and that this constituted an illegal and discriminatory act, under Act No. 100. It is incorrect, since we have expressed that Eurobank had legitimate and not discriminatory reasons to dismiss him. **See Uncontroverted Material Facts Number 32.** In fact, Maldonado never presented any complaint by reason of discrimination while he was an employee of the bank. **See Uncontroverted Material Facts Number 39.** Also, he was recruited at age 60, which confirms that's the Bank does not discriminate by reason of age. **See Uncontroverted Material Facts Number 37.** Inclusively, the persons dismissed together with Maldonado have different ages, which in turn discards the existence of a discriminatory attitude.

**First, it must be remembered that in actions for discriminatory dismissal, <u>the plaintiff has the burden of proof, as in any other civil action, to show the essential element that its dismissal was discriminatory</u>**. "What happens is that the presumption eases the burden if it establishes the basic acts which activate it, that is, that it was dismissed, without just cause and that it is located within the modality of the discrimination under which it claims." Once it is activated, is that defendant has the obligation of persuading the trier of the non-existence of the fact presumed, not before. Art. 3 of said Act No. 100 (29 L.P.R.A. sec. 148) provides a controvertible presumption of discrimination favorable to the employee, which obligates the employer to prove that the dismissal was not discriminatory.

**To activate the presumption of discrimination, the plaintiff employee must prove three elements: (1) that there was a dismissal or damaging action; (2) <u>that it was done without just cause</u>; (3) present evidence indicative of the modality of discrimination which is linked to the dismissal**. It is at that time that the presumption is activated. *S.L.G. Hernandez-Beltran v TOLIC*, 151 D.P.R. 754 (2000); *Belk v Martinez, supra.* the presumption of Art. 3 of Act No. 100, *supra*, comes into play in the probatory phase of the case, that is, it is activated during the trial, not before. **Said article "does not alter in its entirety the probatory scheme which prevails in our jurisdiction, where once the complaint is filed, <u>there corresponds to plaintiff at the trial to start with the presentation of the evidence of its allegations, before defendant is obligated to rebut it."</u>** If plaintiff, during the first turn of evidence, does not

present sufficient evidence to sustain its allegations, defendant does not need to defend itself.   What the presumption established in Art. 3 above, purports is to facilitate to the plaintiff employee proving its claim, **not release it from the need and obligation of presenting evidence to prove its allegations**.   *S.L.G. Hernández-Beltran v TOLIC, supra.*

As of that moment, the *onus probandi* falls on the employer, and should it not present any evidence, there only remains to deem the employee's case proven and adjudicate the damages.   However, the possibility exists that the employer opts to defend itself in several manners, to wit:   **(1) by the presentation of evidence to rebut the presumption of discriminatory dismissal; (2) by providing there was a justified dismissal (just cause); (3)** by providing there was no such dismissal; **or   (4)** by establishing that despite of an unjustified dismissal, **it was not discriminatory**.   *S.L.G. Hernandez-Beltran v TOLIC, supra;  Alberty v Bco. Gub. De Fomento,*  149 D.P.R. 655 (1999).

However, our Supreme Court has resolved that, differentfrom the federal doctrine this does not mean that in our jurisdiction it is necessary that the employer "articulate" affirmatively a reasonable explanation for the dismissal. *Ibañez v Molinos de P.R., Inc.* , 114 D.P.R. 42, 53 (1983).  **IT SUFFICES THAT THE EMPLOYER PROVE, EVEN BY CIRCUMSTANTIAL EVIDENCE, THAT THE REASON FOR THE DISMISSAL WAS NOT DISCRIMINATORY FOR THE PRESUMPTION TO BE DESTROYED.**  *Ibañez v Molinos de P.R., supra.*

In the present case, if the elements of the *prima facie* case are analyzed one by one, we see that Maldonado is not in a position to prove two of these.

Despite that it is clear that Maldonado suffered a prejudicial action (the dismissal – first element of the *prima facie* case), Maldonado is unable to show that said prejudicial act was wrongful (since his negligence and lack of adequate supervision, as well as his dishonesty and lack of cooperation during the investigation justified his dismissal), nor that the it was discriminatory (since Maldonado was recruited when he was more than 60 years old, was recruited by a person within the protected group, and the Bank had legitimate non-discriminatory reasons to dismiss him. Adding to the above is the fact that during his employment in Eurobank, Maldonado never complained about age discrimination. **See Uncontroverted Material Facts Number 39.** Likewise, neither does Maldonado know who made the decision to dismissal. **See Uncontroverted Material Facts Number 35.**

In view of these facts, this Honorable Court must ask itself: How is it possible that a Bank may discriminate against someone it recruited who was over 60 years old? How is it possible that someone can prove age discrimination if it does not know who made the decision to dismiss it (damaging act)? How is it possible that a Bank may be made liable for age discrimination when the supervisor alleging it never complained about discrimination before the management of the institution? It simply cannot be and it would be extremely unjust against Eurobank to find it liable for a discrimination that was clearly inexistent.

Confronted with this reality, Maldonado bases his discrimination claim on certain alleged discriminatory comments made by certain Account Executives of

Eurobank (who were in a lower hierarchal position than he) and a auto dealer representative (who is not an employee of Eurobank, as well as certain questions allegedly made by his immediate supervisor, Mr. Jaime Noble. **See Uncontroverted Material Facts Numbers 41-55.** To that effect, Maldonado adduces that in 2006, two salesmen and a client who were hierchically below him, referred to him as "the old man." **See Uncontroverted Material Facts Numbers 41, 42 and 46.** In fact, Maldonado constantly joked with the employees due to the everyday relationship that existed. **See Uncontroverted Material Facts Numbers 43 and 44.** <u>These comments, even if true, were isolated and made a long time before his dismissal (between 2006 and 2007) and by persons without any decisional authority.</u> Also, Maldonado did not complain about them and due to the time passed, the claim based on these facts would be time-barred.

On the other hand, Maldonado alleges that Mr. Jaime Noble who was born in 1951, his then immediate supervisor, asked "whether if he (Maldonado) was considering retirement." **See Uncontroverted Material Facts Number 53.** Maldonado answered no, since he was planning to work some time more. In fact, between Noble and Maldonado there was a relationship of trust. **See Uncontroverted Material Facts Number 54.** This comment allegedly arose <u>informally</u> in a conversation both sustained about work. **Id**. At no time did Maldonado tell Mr. Jaime Noble that said questions bothered him. **See Uncontroverted Material Facts Number 55.** At the time of the alleged

conversation in January, 2008, Noble was 57 years old and Maldonado 66.  **See Uncontroverted Material Facts Numbers 36, 38, 40 and 53.**

Maldonado alleges that this comment purported to force him to retire. However, such isolated statements and without other facts which may evidence the intention of Eurobank to discriminate against the elderly employees, are not sufficient to activate the presumption of discrimination.  All the more so when Maldonado was recruited at age 60 and despite knowing the proceedings and anti-discrimination policies did not complain*.  **See Uncontroverted Material Facts Numbers 2, 4, 5, 36, 37 and 39.**  In fact, Maldonado was a supervisor, and as such he was in charge of ensuring and administering the discrimination in employment policies. **Id**.  Had said remarks been made, Maldonado cannot claim discrimination because he never complained to anyone in Eurobank (**See Uncontroverted Material Facts Number 39);** never told the persons that those remarks bothered him (**See Uncontroverted Material Facts Numbers 44, 45, 47, 48, 49, 50 and 51**); and did not follow the procedures established by Eurobank to prevent discrimination (**See Uncontroverted Material Facts Numbers 2, 4, 5, 36, 37 and 39).**

**We emphasize, note the Honorable Court that Maldonado was not just any employee; he was a supervisor**.  **See Uncontroverted Material Facts Numbers 9, 10, 12 and 13.**     If he understood that the Account Executives were making discriminatory comments, he could call their attention; he could discipline them; and he could even report them to his immediate supervisor.  However, he never did so.  **See Uncontroverted Material Facts**

**Number 45.** In this same frame of mind, neither did Maldonado complaint to his immediate supervisor about the dealer representative who made remarks; nor did he talk with the Department of Human Resources;  he did not explore other alternatives and/or requested anyone else take care of said representative. **See Uncontroverted Material Facts Numbers 48, 49, 50 and 51.** Assuming that said remarks are true, if these acts of Maldonado show anything it is his ineptitude and inefficiency to exercise the functions of his position, since as supervisor in the end he should have taken other paths.  Eurobank cannot be penalized for Maldonado's negligence or incompetence.

Also, **as we have indicated, Eurobank had legitimate and non-discriminatory reasons to dismiss him in consideration of the irregularities in the Department directed by Maldonado.** This itself defeats any inference of discriminatory attitude on the part of the institution. *Ibañez v Molinos de Puerto Rico,*, 114 D.P.R. 42, 49 (1983).  Before this scenario, this Honorable Court must conclude that Eurobank did not discriminate against Maldonado.

## C.   NEITHER MALDONADO NOR HIS WIFE HAVE A CAUSE OF ACTION UNDER ARTICLES 1802 AND 1803 OF THE CIVIL CODE OF PUERTO RICO.

Having admitted that the only damage he suffered was as a result of his dismissal (and not emotional damages) and not being in a position to establish that his dismissal was discriminatory and/or unjustified, Maldonado and his wife lack causes of action under Articles 1802 and 1803 of the Civil Code of Puerto Rico. Also, these laws are of the general type. **Remember that the provisions**

**of the labor laws of a special nature, such as Act No. 100, prevail over the laws of a general nature as is Article 1802 of the Civil Code**. The Supreme Court has resolved this by resolving that "a law of a special nature over the matter prevails over another of a general nature."   See Art. 12 of the Civil Code, 31 L.P.R.A. sec. 12; *American Ins. Co. v Seguros San Miguel, Inc.*, 161 D.P.R. 589 (2004), *Cordova & Simonpietri Ins. Co. Agency et al v Crown American Ins. Co.*, 112 D.P.R. 797 (1982). Said rule is framed in the general presumption that the legislator knows the text and scope of the legislation in effect at the time of taking new legislative action.

Therefore, there existing a special law – Act No. 100 – which is applicable to the claims of alleged discriminatory treatment, and which grants compensation for damages, this makes the provisions of Article 1802 totally inapplicable. For this reason, any cause of action for damages must be dismissed.

IV.   **THERE PROCEEDS TO ISSUE SUMMARY JUDGMENT UNDER RULE 36 OF CIVIL PROCEDURE**

Rule 36.2 of Civil Procedure provides that summary judgment must be issued when the record shows there is no real substantial controversy over any material fact, and there proceeds to issue judgment in favor of the petitioner as a matter of law. *Audiovisual Language v Sistema de Estacionamiento Natal Hermanos*, 144 D.P.R. 563 (1997). Its purpose is to facilitate the processing of the case, allowing that judgment be issued without need for a trial, when the uncontroverted documents enclosed with the petition show there is no dispute of

29

facts to be settled and there only remains to apply the law. *Corp. of Presiding Bishop v Purcell*, 117 D.P.R. 714 (1986).

**Used correctly, the summary judgment mechanism constitutes an important tool which allows the judges to clean house of frivolities and decongest the judicial calendars**. *A.C.A.A. v Travelers Ins. Co.*, 104 D.P.R. 844 (1976); J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Publications JTS, 2000, T. I, page 594.

For purposes of the motion, the uncontroverted facts which are in the documents and sworn statements offered by the petitioner shall be deemed true. As a general rule, the party opposing the motion may not merely rest on its allegations to defeat it, rather it must present documents and sworn statements which contradict those of the petitioner as to the material facts in controversy. Rule 36.5 of Civil Procedure, 32 L.P.R.A. Ap. III, R. 36.5; *Jusino v Walgreens of San Patricio, Inc.*, 2001 J.T.S. 154 at page 373;   The appropriateness of the summary judgment has been recognized in the context of the labor claims. *Jusino v Walgreens of San Patricio, Inc., supra;* *Santiago v Corco*, 114 D.P.R. 267, 270 (1983);   *Pagan v Fundación Dr. Pila*, 114 D.P.R. 224, 225 (1983); B.C.R. *Medina-Muñoz v R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990). This is consistent with the objective of resolving labor controversies, quickly, efficiently and economically.

**With this procedural mechanism the just, quick and economic solution of civil litigations is facilitated when these do not present genuine controversies of material facts**. *Luan Invest. Corp. v Rexach Const. Co.*, 152

D.P.R. 652 (2000).  [*15]  The purpose of this rule is to facilitate the processing of a case because a trial is not necessary, since the uncontroverted documents enclosed with the motion for summary judgment show there is no real and substantial controversy of facts, and there only remains to apply the law.  *Corp. of Presiding Bishop CJC of LDS v Purcell*, 117 D.P.R. 714 (1986).  **In this manner useless trials are avoided, as well as the expenditure of time and money entailed by this to the parties and the court.**  R. Hernandez Colon, *Práctica Jurídica de Puerto Rico:  Derecho Procesal Civil,* 4th ed., San Juan, LexisNexis, 2007, Sec. 2616, page 240.

On its part, the person opposing the issue of summary judgment must controvert the evidence presented and must not remain idle.  If it does so it runs the risk that the motion for summary judgment is accepted and resolved against it.  *Luan Invest. Corp. v Rexach Const. Co., supra*.  That is, the party who opposes is obligated to answer in a detailed and specific manner those facts pertinent to show there is a real and substantial controversy which must be elucidated in a trial.  **On the other hand, any doubt is not sufficient to defeat a motion for summary judgment.   It must be a doubt which allows concluding that there is a real and substantial controversy on relevant and pertinent facts.**

In fact, recently the Supreme Court of Puerto Rico, in *Ramos v Univision*, 2010 TSPR 15 stated:

> **[...] this does not prevent the use of the mechanism of summary judgment which require subjective elements or of intention, as happens in a case of discrimination when the documents to be considered in the motion for**

31

**summary judgment show that there is no controversy as to the material facts**.  For this reason, our case law has validated the use of this mechanism in cases of discrimination when the lack of controversy over the material facts is clear.  Lopez v Miranda, *supra*. n1

----- Marginal Notes -----

N1   **Similarly, the U.S. Court of Appeals for the First Circuit has resolved that even in cases in which subjective elements of motive or intention are required, there proceeds to issue summary judgment when the party against whom it is filed rests only on conclusive allegations, improbable inferences and unsustained speculations**.  *Medina-Muñoz v R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990).

By acting thus, we have been consistent with the rule that "Rule 36 is not excluded as a matter of law from any proceeding in particular."  Garcia Lopez v Mendez Garcia, 88 D.P.R. 363, 380 (1963).  See also, Soto v Hotel Caribe Hilton, *supra*.

***

**For a similar reason, the Supreme Court of the United States has liberalized the summary judgment to convert it into a valuable mechanism against claims based on [\*25] speculations and inferences.**  Consequently, the case law of the U.S. Supreme Court  on summary judgment has had an impact not only on lower federal courts, but also on state courts. E.K. Yamamoto, Summary Judgment at the Crossroads: The Impact of the Celotex Triology, 12 U. Haw. L. Rev. 1 (1990).

**We must remember that this procedural mechanism adequately watches out for the balance between the right of all litigant to have its day in court and the just, quick and economic disposition of civil litigations**.  It is not that the summary judgment is disfavored  in any type of claim in particular, or is limited to extraordinary circumstances but that upon applying it, it must proceed pursuant to Rule 36 of Civil Procedure, *supra*, and addressing the particular facts in each case.  **For that reason, if used correctly, the summary judgment mechanism constitutes an important tool which allows the judges to clean the house of frivolities and**

> **decongest the judicial calendars**. A.C.A.A. v Travelers
> Ins. Co., 104 D.P.R. 844 (1976); Cuevas Segarra, op. cit.
> page 594 (emphasis ours).

A careful study of the writings herein submitted generates the clear conviction that the material facts in this case are not in controversy. In summary, it has been shown that there is no controversy that there was just cause for plaintiff's dismissal. For such reason, there is no reason which justifies a trial in this case. **Nothing exists either which prevents this Court from issuing summary judgment in this case and it is thus requested.**

**WHEREFORE**, we very respectfully request this Honorable Court issue judgment **summarily dismissing the above captioned claim**, with prejudice, since the plaintiff's admissions clearly establish that his dismissal was justified, since it obeyed his negligence and ineptitude. Also, the existence of justified reasons for his dismissal, discard his allegation that it obeyed discriminatory motivations. In fact, plaintiffs lack evidence for this and bases its claim on mere speculations and groundless inferences.

**RESPECTFULLY SUBMITTED**.

I CERTIFY that on this same date I have sent a true and exact copy of this writing to **Ruben Nigaglioni, Esq., P.O. Box 195384, San Juan, Puerto Rico 00919-5384.**

In San Juan, Puerto Rico, March 19, 2010.

FIDDLER GONZALEZ & RODRIGUEZ PSC
P.O. BOX 363507
San Juan, Puerto Rico 00936-3507
Tel. 759-3149 / 759-3102
Fax: 250-7565 / 759-3123

s/ illegible
CARLOS A. PADILLA VELEZ
Bar membership No. 12,748 /PRSC 11,482


s/ illegible
JAIME SANABRIA MONTAÑEZ
PRSC No. 14,260

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

EXHIBIT 1

## SWORN STATEMENT

I, Aida Mendez, of legal age, married, Vice President of Human Resources of Eurobank and resident of Caguas, Puerto Rico, state under oath that:

1.   The above are my personal circumstances.

2.   Eurobank is a financial institution which has several operational divisions, among these, Eurolease, in charge of motor vehicle and equipment leasing.

3.   Eurobank has an *Associates Manual* which contains the standards and policies of the company, among these those which prohibit discrimination and establish a complaints mechanism.   Said manual is provided to all the employees.

4.   On March 12, 2001, Maldonado started as employee of the Eurolease division of Eurobank, and on that same date, he received copy of the *Associates Manual and Rules of Conduct* of the institution.

5.   When he started to work for Eurobank, Maldonado was 60 years old.   Maldonado was recruited by Mr. Jaime Noble, who was his immediate supervisor.  Mr. Jaime Noble was born on February 5, 1951.

6.   Through the years, Maldonado received copy of the amendments to the policies and standards of the company.

7.   During his employment in Eurobank Maldonado never presented any complaint of discrimination in employment.

8.   Maldonado was dismissed on January 11, 2008.

9.   At the time of his dismissal, I was the one who informed Maldonado he was being dismissed due to inefficiency in his supervisory functions.  He was specifically dismissed for the matter of the "double penalty" which had been charged to the clients in the cancellation balances and for lying during the investigation regarding the same.

10.   The company also dismissed for that same situation, two employees who were under Maldonado's supervision:  Mr. Isaac Fernandez and Mrs. Rosa Calo.

11.   At the time of his dismissal from Eurobank, Maldonado was 66 years old.

12.   The above is the truth according to my best knowledge and I render this Sworn Statement freely and voluntarily.

IN WITNESS WHEREOF, I sign and subscribed it in San Juan, Puerto Rico, March 19, 2010.


s/ illegible
AIDA MENDEZ

Affidavit No. 68

Sworn to and subscribed before me by **Aida Mendez**, of the aforementioned personal circumstances, who is not personally known to me and I have identified her by her driver's license number 897149, which contains a picture and the declarant's signature, issued by the Commonwealth of Puerto Rico.

2

In San Juan, Puerto Rico, March 25, 2010.

s/ illegible
Notary Public

There appears the Notary Public Seal:

Jeanette M. Collazo Ortiz
Attorney – Notary

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

?

**EXHIBIT 2**

COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR PART SAN JUAN

| | |
|---|---|
| LUIS R. MALDONADO VAILLANT AND VICKY RODRIGUEZ TORRES, | CIVIL NO.: KPE2008-0872 |
| Plaintiffs, | Re: ALLEGED WRONGFUL DISMISSAL, DISCRIMINATION and DAMAGES |
| V | |
| EUROBANK, | |
| Defendant. | |

TAKING OF DEPOSITION OF MR. LUIS R. MALDONADO VAILLANT

DATE           :     January 8, 2009

TIME           :     9:45 a.m.

CLIENT         :     FIDDLER GONZALEZ & RODRIGUEZ

ADDRESS        :     BBVA Plaza – 6th Floor
                     Hato Rey, Puerto Rico

PRESENT

FOR PLAINTIFF:

    Rafael Martinez Garcia, Esq.

FOR DEFENDANT:

    Carlos A. Padilla Velez, Esq.

NOTARY PUBLIC:

    Aurymar Sanchez, Esq.

DEPONENT:

    Mr. Luis R. Maldonado Vaillant

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

REPORTER OF RECORD:

Mrs. Ramonita Irizarry.

OTHERS PRESENT:

Mrs. Vicky Rodriguez Torres

Mrs. Aida Mendez

--------------------

The proceedings developed as shown in the following transcript.

NOTARY:

Good morning. I am attorney Aurymar Sanchez and I am going to be the Notary today to swear in the Reporter as well as the deponent.

Madam Reporter, raise your right hand, please, and state your full name.

REPORTER OF RECORD:

Ramonita Irizarry.

NOTARY:

Mrs. Irizarry, do you swear to faithfully transcribe all the proceedings held today?

REPORTER OF RECORD:

I swear.

NOTARY:

Deponent, raise your right hand please and state your full name.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

2

DEPONENT:

Luis R. Maldonado Vaillant.

NOTARY:

Mr. Maldonado, do you swear to answer with the truth and only the truth all the questions asked you today?

DEPONENT:

That is correct.

NOTARY:

They are duly sworn in.

PADILLA, ESQ.:

Sister counsel Aurymar Sanchez is duly excused.  Thank you.

MARTINEZ ESQ.

Thank you.

PADILLA, ESQ.:

For the record, I am attorney Carlos A. Padilla Velez.  It being January 8, 2009, 9:45 a.m., we start the deposition of Mr. Luis R. Maldonado Vaillant.  In the case of Luis Maldonado v Eurobank, Inc. before the Court of First Instance, San Juan Part, Civil No. KPE2008-0872.  Present is Mrs. Aida Mendez, the Vice President of Human Resources of Eurobank and Mrs. Vicky Torres.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

3

A.     Uh huh.  Correct.

P.     Do you remember the employees which Natalie Garcia had under her charge?

A.     Natalie had Rosa Rivera, Elizabeth Rijos, Milady Jimenez, Daisy Reyes, Eliza Carrion and Waleska Gracia.

Q.     Where did Mrs. Rosa Calo work?

A.     In the Client Service Area.

Q.     With Isaac Fernandez?

A.     Correct?

Q.     And that was, more or less, the structure you had under your charge when you ceased in employment.

A.     That is correct.

Q.     I am going to show you some documents they basically consist in your acknowledgements of receipt, when you started with the Bank. I would like you to review them.

                    …The deponent examines the documents…

PADILLA, ESQ.:

Q.     Where you able to review them?

A.     Yes.

Q.     Is that your signature Mr. Maldonado?

A.     That is correct.

Q.     And that document is really a receipt of certain policies and standards which the Bank delivered to you at the given time indicated in the document.  Mr. Maldonado, have you read the complaint you filed?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

4

A.      December of 2007 and January 2008.  Mr. Jaime Noble in official meetings we held, on two or three occasions approached me to tell me why I didn't consider retirement.  The first time he made the approach I told him clearly "I expect to work three or four more years because I need to repay some debts I have."

Q.      You thought to work three or four more years.

A.      Correct.

Q.      And you say that it was Mr. Noble who made that approach as to when you were going to retire.

A.      Right.

Q.      Any other comment?

A.      No.

Q.      That comment of Mr. Noble was on that occasion?

A.      Several occasions.

Q.      On how many occasions?

A.      About on three or four occasions?

Q.      Can you specify the specific circumstances of those occasions?

A.      No, because they are situations where I went to his office to discuss official matters and between one thing and another well at the end of the conversation the matter of the retirement came out.

Q.      Should I understand that these conversations occurred only between you and Mr. Noble?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

5

A.     That is correct.

Q.     There was no one else present?

A.     That is correct.

Q.     And in what context do you mention that Mr. Noble made that remark?

A.     What do you mean in what context?

Q.     When you talked about what?

A.     Official matters.   That is, I had to take something to him where I needed his approval, or to update him on some situation and then, well in that situation.

Q.     Had you previously talked about your retirement or his retirement?

A.     No, as I say, during the month of December and January.

Q.     Prior to that had you talked at any other time about retirement?

A.     Only in the month of December and January.

Q.     I should understand no.

A.     Right.

Q.     Had you mentioned to anyone that you wanted to retire?

A.     Negative.

Q.     Did you at any time ask Mr. Noble if he was planning to retire?

A.     It was none of my business.

Q.     What did you understand by that remark?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

A.    What it clearly says that I opt to retire.

Q.    But what he was asking was if you were thinking about retiring.

A.    No, no, he was telling my why didn't I retire.

Q.    What did Mr. Noble tell you, that?

A.    Why don't you retire?

Q.    And what did you answer him?

A.    As I said, the first time he mentioned that I told him I was going to work three or four years more until I paid up some debts.  And I could retire well with more economic tranquility.

Q.    And the subsequent times what did you answer him?

A.    I told him no, that I was not in a condition to retire.

Q.    That you were not in a condition to retire.

Q.    Did you mention that remark to anyone?

A.    To anyone, negative.

Q.    Did you trust Mr. Noble?

A.    About work, yes I trusted him.

Q.    In fact you knew him, you said since…?

A.    Yes, yes, that's why, but to know him does not mean there is closeness.

Q.    Did you partake with Mr. Noble outside of working hours?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

7