A.    Very rarely.

Q.    But you partook?

A.    At some time.

Q.    Social activity?

A.    Yes, social of the bank.

Q.    He was your immediate supervisor, no?

A.    That is correct.

Q.    Did that remark bother you?

A.    Definitely.

Q.    Did you tell Mr. Noble?

A.    When he told me I answered, "I am going to work four more years, three or four

years, and that's it."

Q.    What I want to ask is if you told Mr. Noble that the remark bothered you.

A.    No, I did not tell him.

Q.    Did you perceive that remark as discriminatory?

A.    I understand it was, because if I am in condition to work I don't see why they

have to suggest I retire.

Q.    Did you suggest to anyone at any time to retire?

A.    Negative.

Q.    If you feel discriminated, why didn't you go to the Human Resources

Department?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

A.     It was not comfortable to make a presentation of that condition.

Q.     It was not comfortable to you.

A.     No.

Q.     What do you mean by that?

A.     Well, we are talking about my direct supervisor and I, well I was not going to feel comfortable working once I established that complaint.

Q.     That you were not going to feel comfortable.

A.     Right.

Q.     And why weren't you going to feel comfortable, were you requesting a right?

A.     But it is my way of… as I see it.

Q.     It was your perception?

A.     Exactly.

Q.     Despite that you knew that the Bank had certain standards and a policy against harassment.

A.     Correct.

Q.     And did you know what the channels to address that type of complaint were?

A.     That is correct.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Q.   And despite you knowing those procedures you opted to not follow them?

A.   To not file a complaint.

Q.   To not file a complaint.  To not file a complaint or tell Mr. Noble that you did not like that remark.

A    That well definitely I did not tell him…

Q.   In your function as supervisor, did you handle any complaint of any employee who felt discriminated?

A.   Not that I recall.

Q.   And in the prior employments?

A.   I don't remember.

Q.   You don't remember.  Do you remember that you were in the Harassment Prevention Committee in Ponce Federal?

A.   That is correct.

Q.   You don't remember having handled any complaint at that time?

A.   Frankly I don't remember no.

Q.   In fact, the complaints were presented in Eurobank through the Human Resources Department, is not even with the immediate supervisor.

A.   Uh huh.

Q.   That is, that is a separate person, a separate entity who handles the complaints. Isn't that right?

A.   Yes.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Q.    And when one had to talk about work you talked…

A.    I went to his office.

Q.    …in his office.  In yours also or not?

A.    Principally in his office which had a table available for that.

Q.    And in those six years that you worked for Eurobank Mr. Noble was always your immediate supervisor?

A.    That is correct.

Q.    Let's go to the remark about the "old man."  You say that those remarks were made by the sales personnel.

A.    Uh huh.

Q.    Who made those remarks to you?

A.    Mr. Joaquin Pineda.

Q.    Joaquin Pineda.

Q.    Uh huh.  Who was a Sales Executive.

A.    Who else?

Q.    And Marcos Solis.

A.    Marcos Solis.  He was also a sales executive?

Q.    That is correct.

A.    And when did those remarks occur?

Q.    Situations that they came to the office or we were in the lunch or we were in the group of the work area, the Quality Area.

Q.    In what years did those remarks occur?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

11

A.    2007 or 2006.

Q.    Do you know the months?

A.    Negative.

Q.    And what did they tell you?

A.    Well, "I am coming to the old man to resolve this for me."

Q.    "I am coming to the old man to…"?

A.    To resolve this for me.  Or what the old man doesn't know no one knows.

Q.    Any other remark aside form those two you have mentioned…

A.    Practically…

Q.    …aside from those two gentlemen, Joaquin Pineda and Marcos Solis?

A.    Practically that was the phrasing.

Q.    And those persons who did they report to?

A.    They first reported to… well, they reported to Juan Carlos Wolf.

Q.    Juan Carlos Wolf.  And Juan Carlos Wolf was one of the managers.

A.    He was the Sales Manager.

Q.    Of Eurolease, right?  They were hierarchically at your same level?

A.    Correct.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Q.     And you called the attention of these persons, to Joaquin Pineda and to Marcos Solis?

A.     A couple of things that arose the situation, and I told them "Stop that joke."  But they insisted.

Q.     It was a joke they did   towards you?

A.     I cannot say it was a joke, that is, I told him that particular.

Q.     Why did you use that word joke?

A.     Because I believe that it is a remark that…

Q.     You perceived it as a joke?

A.     Not necessarily.  That is, a simply discriminatory remark.

Q.     And why do you catalogue it as a joke?

A.     No, because it is a remark, as I say, that is not usual, it is not the usual remark between a superior and another person.

Q.     To you it was a joke.

A.     Not necessarily.

Q.     And what did they say when you told them "Stop that joke."

A.     They laughed.

Q.     And you said that in the beginning you perceived that remark as something funny.

A.     As funny?

?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

13

Q.   Uh huh.  I believe that was what you said in the beginning, before.

A.   I don't think I mentioned the funniness.

Q.   No.

A.   No.

Q.   That remark bothered you?

A.   Definitely.

Q.   A lot, does it bother you a lot?

A.   Yes, it bothers me because they are talking in a way...within the group I understand I was the oldest.

Q.   And the one with more hierarchy as to them.

A.   As to them, yes.

Q.   And you being the person with most hierarchy what did you do?

A.   Absolutely nothing.

Q.   You did nothing.

A.   That is, aside from the comment I made, no.

Q.   You did nothing with them?

A.   There was no later action, no.

Q.   You didn't even mention it to Juan Carlos Wolf?

A.   Negative, I don't remember, I don't remember having mentioned anything to him.

Q.   Did you mention it to anyone?

A.   I don't remember.

Q.   Did you joke with them?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

14

A.      It could happen in some manner.

Q.      I am referring to Joaquin Pineda and Marcos Solis.

A.      That is why I say, it could be that there would be a situation where, well we exchanged some type of joke.

Q.      Such as?

A.      I don't know, I can't tell you because they are situations which arise.

Q.      That is, that you exchanged jokes between that is what you mean.

A.      Yes we exchanged, there are situations.

Q.      And aside from Joaquin Pineda and Marcos Solis, who else did you exchange jokes with?

A.      I am unable to go into details.

Q.      You don't remember the names of the persons?

A.      No.

Q.      But you did it with other persons?

A.      I could have.

Q.      And what type of jokes did you make with them?

A.      I cannot say because they are situations.

Q.      Yes, but what situation do you recall?

A.      I don't remember.

Q.      You don't remember any?

A.      I don't remember any.

Q.      Do you remember that they made those remarks but you don't remember those you made to them?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

15

Q.    Who do you recall were present when some type of remark of that type was made?

A.    I am unable to specify.

Q.    You don't remember anyone?

A.    I am unable to say.

Q.    And you mentioned that those gentlemen when they went to your office area was in the afternoons.

A.    Usually. That is, there is no schedule for them to go in the morning or in the afternoon, as the cases arose.

Q.    And you mentioned that you don't remember the dates on which these events occurred.

A.    Negative.

MARTINEZ ESQ.

He would tell you specific dates because later, before he said 2006-2007.

PADILLA, ESQ.:

Q.    Yes, but aside from…that is, you cannot place those remarks in a month and day.

A.    No.

Q.    You mention generic years.

A.    Right.

Q.    2007 and 2006. And the remarks were "I am coming to this old man so that he resolves this or what the old man doesn't know no one does."

A.    That is correct.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

16

Q.   Those were the comments.  You also mention that a dealer also made remarks.

A.   Uh huh.

Q.   When you refer to a dealer, what do you mean, a person who performs the functions of a dealer?

A.   A dealer representative, right.

Q.   Excuse me.

A.   A representative of a dealer.

Q.   A representative of a dealer. Who was that person?

A.   Juan Maceda.

Q.   Juan…

A.   Maceda.

Q.   …Maceda.  What dealer did Mr. Maceda work for?

A.   JM Auto Group.

Q.   JM Auto Group.  Where is that dealer located if you know?

A.   On the road from Caguas to Rio Piedras.

Q.   And where did those remarks occur?

A.   In the office.

Q.   In yours or in Maceda's?

A.   In mine.

Q.   What was the remark?

Q.   I am coming so the old man resolves these cases which I have for disbursement."

Q.   I am coming so the old man resolves these cases which I have for disbursement.?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

17

A.    "These cases."

Q.    Cases.

A.    "So that the old man resolves the cases I have for disbursement."

Q.    And how many times did Mr. Maceda make that remark?

A.    Several times.

Q.    At what time was that?

A.    When he had some problem with the cases that were held up for disbursement.

Q.    In what month and year, if you know?

A.    Perhaps 2007, 2006.

Q.    Since when did you know Maceda?

A.    Let's say we interacted at some time while I was at the Kennedy, but I am unable

to specify how long.

Q.    How long were you at Kennedy,  you said four years.

A.    About four years, yes.

Q.    And you  also joked with Maceda?

A.    No, sir.

Q.    How frequently did you talk with Maceda?

A.    Whenever he had problems with the cases for disbursement.

Q.    You say that Maceda was a dealer.

A.    Right, JM Auto Group.

,

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

A.   Yes, he laughed.

Q.   When did you tell him to stop that remark, the first time, the second?

A.   The first time he did it.

Q.   The first time. And later what did you do the second time?

A.   I remained seriously disgusted.

Q.   Did you at any time tell Maceda on a second occasion that you did not like that?

A.   No, I don't remember.

Q.   You didn't tell him or you don't remember?

A.   I don't remember.

Q.   Did you mention it to anyone in the Bank?

A.   I don't remember.

Q.   Did you tell the Bank that someone else take care of that person?

A.   Negative.

Q.   Why didn't you ask that?

A.   Because that was part of my functions.

Q.   Because that was part of our functions.

A.   Yes, take care of the dealers, yes, when necessary.

Q.   Did you mention that situation to Jaime Noble or not?

A.   Negative.

Q.   Much less to Human Resources.-

A.   That is correct.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

19

Q.   Should I understand that these remarks that you have made, as you told me before, are those which you allege occurred and on which you base to make your claim for age discrimination?

A.   That is correct.

Q.   Listen and you say that this discrimination has caused you economic damages.

A.   That is correct.

Q.   What do those damages consist of that you impute to that conduct which you catalogue as discriminatory?

A.   Well, I lost my job.

Q.   Pardon me.

A.   I lost my job.

Q.   You lost your job.  What else?  What other damage do you impute to that type of conduct?

A.   Well, they are damages which have affected my reputation by being dismissed and where people questioned how the dismissal occurred.

Q.   You said you lost your job and reputation by being dismissed and that the people questioned how the dismissal occurred.

A.   Yes, and my health condition was affected.  That never in my life had I gone to a psychiatrist.  At my age looking for a job is highly difficult due to the matter of the age.

Q.   Why due to the age, Mr. Maldonado?

A.   Well, definitely, that is, a person of the age

,

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

20

A.    I have explored but as I say, without positive results.

Q.    What sectors have you explored that are not in banking?

A.    Well, what is in the classifieds that right now, I am unable to say.

Q.    Excuse me.

A.    What has come out in the classified.

Q.    But when you say what has come out in the classifieds what do you mean?

A.    In employment offers.

Q.    Which?

A.    Offers that have come out in the newspapers.

Q.    What have you done with those offers?

A.    Well, a resumé has been sent.

Q.    You have sent a resumé.  Do you remember what other institutions other than banking nor the federal government that you have sent resumés to?

A.    To the financing companies.

Q.    No other?

A.    Up to there yes.

Q.    Look, that is, that the loss of your job you blame it on those remarks that you alleged occurred.

A.    The lost of my job is due in part to the comments and the action taken due to another situation that exists in the Bank.  But, as I say, the damages suffered in my health

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

21

definitely involve all this part of the remarks they started to make and the effect after I was left without a job.

Q.    You tell me that you blame the loss of your job in part on those remarks  and another situation which occurred in the workplace?

A.    That is correct.

Q.    What was that other situation that occurred in the workplace?

A.    The misappropriation of an employee.

Q.    Who was that employee?

A.    What?

Q.    Who was that employee?

A.    Rosa Calo.

Q.    Rosa Calo.  She was the one you mentioned was…

A.    In Client Service.

Q.    …in the Client Service Area under the supervision of Isaac Fernandez and in turn under your supervision.

A.    And under my supervision.

Q.    What happened with that lady?

A.    Well, she availed herself…she appropriated several checks which belonged to certain clients and negotiated them fraudulently together with another person from Banco Popular.

,

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

22

the leases were an area within the Operations Department that you directed.

A.     That the cancellation can come from two areas, or directly by the client or by a dealer.

Q.     By a client or by a dealer.  And in both they were processed in your department?

A.     In the Client Service Department.

Q.     Client Service.  That was in turn was assigned to your Operations area.

A.     Of Operations, correct.

Q.     And what did that additional penalty apply consist of Mr. Maldonado?

A.     It corresponded to one month or 5% of the balance, whichever was less.

Q.     One month…

A.     Of the principal or 5%, whichever was less.

Q.     5% of the principal balance.

A.     Of the principal balance.

Q.     Of the principal balance. And that penalty was imposed by Banco Cooperativo or by Eurobank?

A.     It was imposed by Client Services.

Q.     That is, that it was imposed by the department you directed.

A.     Yes. That penalty…

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

only to the part of Banco Cooperativo is what you want to say.

A.      Correct.

Q.      And that additional penalty was not contained in the Lease Contract.

A.      That is correct.

Q.      That is, that the client usually did not know it existed, it was not in the contract.

A.      Yes, the client…that is, that portion was not in the contract, no, definitely.

Q.      That the client was unaware of that…

A.      Of that second transaction.

Q.      …second penalty.  And the client Services Department was the one supervised by Mr. Isaac Fernandez, you said.

A.      Correct.

Q.      And you in turn supervised Mr. Fernandez.

A.      That is correct.

Q.      Should I understand that you were aware of the existence of that second penalty?

A.      At the time Mr. Fernandez approached me for that additional penalty, I told him that was against the contract, of the terms of the contract.

Q.      And when was that?

?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

A.    Disciplinary, none was taken, he was merely…

Q.    You did not take any disciplinary action?

A.    …told to stop taking the double penalty.

Q.    But until that moment when you learn you take no disciplinary action against Isaac.

A.    No, definitely.

Q.    Despite that you had told us that it was contrary to the lease contract.

A.    Uh huh.

Q.    And once you sent that e-mail communication, how did you make sure that Mr. Fernandez complied with your guideline?

A.    Well, as supervisor that I was and we not having doubt as to his performance, except at that time, we understand that he is going to carry out what he was being told.

Q.    Did you verify at any time after December 2006…

A.    I don't remember.

Q.    …that Mr. Fernandez was effectively complying with that guideline?

A.    I don't remember.

Q.    That is, you rested or trusted that Mr. Fernandez was going to comply.

A.    Yes, Mr. Fernandez was a person with a lot of…very committed to the company.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Noble, you didn't immediately go to the office of Mr. Noble to discuss this matter?

A.    Negative.

Q.    No.

A.    That is usual of Noble in making decisions and if one finds out, one finds out.  If one finds out, one finds out.

Q.    But you as person in charge of the area, supervisor of Isaac Fernandez who was in turn supervisor of Rosa Calo, you didn't go to Jaime Noble to discuss this matter?

A.    No because there was no reason to discuss it, if Noble approves it, he approves it.

Q.    Excuse me.

A.    If Noble had already approved it, it was a matter that I could not go over him.

Q.    At that time you didn't know if Noble had approved it or not?

A.    Well, if Isaac Fernandez goes to my office to request the consent for the double penalty and I say no, and he goes to Noble and when he comes out he tells me "the Chief Commander knows about the penalty."

Q.    That was sufficient for you?

A.    Yes, definitely.

Q.    You did not confirm it Mr. Noble?

A.    No, I did not confirm it with Noble.

Q.    Despite that you knew that was contrary to certain

ا

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

A.    The letters did no go through my hand, the cancellations went directly to accounting.

Q.    But you were the head of Operations.

A.    Alright, but I do not have intervention with each transaction made by the department.

Q.    But if you already knew by that statement made by the Account Executive, who alerted you, Isaac Fernandez was charging an inappropriate penalty, you could have easily verified later transactions to make sure that Isaac Fernandez was complying with the guideline that you gave him in December 2006, could you do that?

A.    It could have been.

Q.    And did you do that?

A.    I don't remember.

Q.    You don't remember.

A.    I don't remember.   And if he did it, you say that in the Banco Cooperativo portfolio that double penalty was charged.

A.    Yes, they were charging it…that is, it was, for what the double penalty was done when Isaac brought it to my office.

Q.    Therefore, if you had examined a file of that portfolio when Isaac gave you a cancellation, you were going to notice that Isaac Fernandez continued with the practice of collecting a penalty other than the one agreed.

A.    What happens and I mentioned it again, the cancellations went directly to the Client Services Department to

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

detect whether Isaac Fernandez continued or not with that practice since you had already told him to discard it, right?

A.      That is possible.

Q.      In fact, look and see if you remember that the money that Mrs. Rosa Calo appropriated principally corresponded to excesses of the account of Banco Cooperativa which corresponded to clients for having precisely charged a penalty that did not correspond?

A.      Uh huh.

Q.      And that that money was the one that Mrs. Calo appropriated, you know that?

A.      Yes that I remember, yes.

PADILLA, ESQ.:

It is 12:00, if you wish let's make a brief recess to eat.

...Recess taken...

...AFTERNOON SESSION...

BY PADILLA, ESQ.:

Good afternoon.  It is 1:52 p.m. we continue with Mr. Maldonado's deposition.

Q.      I believe we were talking Mr. Maldonado, and correct me, that you had not talked with Mr. Noble about the matter of the double penalty which Mr. Isaac Fernandez was charging the clients of the Banco Cooperativo portfolio.

?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

28

A.    That is correct.  Definitely, that is, I had nothing to talk to him about because if he agreed with that, his order was firm and final.

Q.    But that you …what I want is to be clear that you did not talk directly with Mr. Noble about this matter?

A.    I definitely did not believe it was necessary.

Q.    Therefore, you did not talk about it.

A.    No, I did not talk to him.

Q.    Mr. Maldonado, do you know the approximate age of Mr. Jaime Noble?

A.    I have no idea.

Q.    In your appreciation is he contemporaneous with you or is he younger?

A.    No, he is younger than me.

Q.    Younger.  A lot younger?

A.    He must be in the early 50s.

Q.    Would you say that is, more or less, 10 years younger than you?

A.    No, no, much more.

Q.    At present you are 67.

A.    I am going to be 68 soon.  I believe he is fifty something.

Q.    Then you had told me, I don't know if it is repetitive, but if it is pardon me, did you learn the result of the

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

29

Q.    You don't remember having told him anything.  Do you know if anyone else was dismissed besides Isaac and you?

A.    Prior to that date Rosa Calo.

Q.    Rosa Calo.  Did you participate in any of the decisions of the dismissal of these two persons, of Isaac and of Rosa Calo?

A.    Directly.

Q.    Yes.  Did you participate indirectly?

A.    Well, when we determine that that she had taken that money, well that was one of the alternatives that I told her would happen that she would be dismissed.

Q.    Can you repeat that last part, indirectly when you…

A.    That is, when the matter of the investigation arose I told Isaac they were going to dismiss her.

Q.    You told Isaac.

A.    Isaac.

Q.    Did you mention it to anyone else?

A.    I don't remember.

Q.    do you know who made the decision to dismiss you?

A.    I presume it was the Bank management.

Q.    But someone in particular?

A.    In particular I cannot point to anyone.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

A.    Yes.

Q.    What did they tell you?

A.    I don't remember.

Q.    Do you remember what you told those persons?

A.    Neither.

Q.    The conversation you had.

A.    I was merely dismissed.

Q.    Those were the last persons employed in Eurobank with whom you talked about

your dismissal or have you thereafter talked with anyone else?

A.    About the dismissal I believe it was with these.

Q.    And those were calls to your residence or…?

A.    Right.

Q.    When did you decide to file a claim?

A.    No, once I received advice, that is, after the blow eases, well…

Q.    You filed this claim on March 6, 2008.

A.    Uh huh.

Q.    More or less, two months later.

A.    That is correct.

Q.    Listen, you had told me that you went to Dr. Jose Sanchez in May.

A.    In May.

Q.    That is, it was after you had filed the Complaint.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

A.      That is, the number of persons I am unable to tell you, but how the information was spread I don't know.

Q.      But what information was the one they learned about Rosa Calo, those persons that you don't know?

A.      Well, that I was definitely dismissed due to an adverse situation in the handling of certain checks.

Q.      That those persons who learned of that information you don't know who they are?

A.      No.

Q.      And you say that Isaac Fernandez was responsible for Rosa Calo's performance.

A.      That is correct.

Q.      I ask you perhaps Isaac Fernandez's performance was not your responsibility?

A.      Yes.

Q.      That is, in the chain of command, Isaac was responsible for Rosa Calo and you were responsible for Isaac and for Rosa also.

A.      Yes.

Q.      Do you know what position was occupied by Rosa Calo?

A.      Customer Service Officer, Clerk.

Q.      And you also told me that your health condition had been affected.  When you talked about that, did you mean that you had to visit Dr. Sanchez or any other ailment?

A.      I had to visit Dr. Sanchez, I had to go to the cardiologist.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

32

have made an analysis of the contracts versus the cancellations which were being charged could discover if Isaac was complying or not with your instructions.

A.     I mentioned to you…

Q.     Yes or no?

A.     Yes, I believe so.

Q.     And you told me what?

A.     And I told them that the cancellations do not come into my hands, they went directly with the cancellation sheet to the Accounting Department, who finally tallied the case and issued the check for the excess.

Q.     If well it is true that perhaps the cancellations did not come to you, it was the Client Service Department under your supervision who determined what was the balance pending at the time that the client wanted to cancel, isn't that right?

A.     Yes, the balance is what is in the books, there was no alteration there.

Q.     But it was the Client Service Department who determined what amount the client had to pay?

A.     It informed the client.

Q.     Sure, it informed the client.

A.     But who determined what amount was in the books is in the end Accounting.

？

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

33

Q.   Look, the truth is that you in your last year of work, did not get a salary increase, isn't that right?

A.   Not the last year, no, the raises are given in December, so that…

Q.   And that year you did not get a raise.

A.   No, this past year, 2007, no.

Q.   In 2007 you did not get a raise.

A.   No.

Q.   I am going to show these e-mails.  They are several, please, be so kind as to examine them.

                    …The deponent examines the documents…

PADILLA, ESQ.:

Q.   Did you review them Mr. Maldonado?

A.   Yes.

Q.   Those e-mails are generated by you, those three or four e-mails, correct?

A.   That is correct.

Q.   And the first one is of July 2005, where you send a memorandum dated April 2005, several months before as to the procedure which must be followed in the cancellation balances.  It is in the second sheet I believe that the document is attached. Did you see it?

A.   Yes.

Q.   There you state that the penalty is a rent or the 5% of the net payoff, whichever is less.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

34

A.     Correct.

Q.     That is the only penalty which the Bank is authorized to charge?

A.     That is correct.

Q.     In the second document which is of January 20, 2005, you address it to Isaac
Fernandez and give him instructions no, about the manner in which Isaac had to instruct
ht personnel to certify the cancellation balances.

A.     Uh huh.

Q.     That is, that those certificates of cancellation balances were generated in the
Client Service Area as you have told me.

A.     Right.

Q.     Then the third e-mail is one of December 2006 addressed to Isaac Fernandez
about double penalty.  And that is the one in which you tell him to immediately eliminate
the double penalty in the cancellation balances.

A.     Uh huh.

Q.     Aside from that communication was there any other in writing in which you
instruct Isaac not to charge that double penalty?

A.     I am unable to specify at this time.

Q.     You don't remember.  And you send this e-mail when the Accounts Executive
brought to your attention that they had

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

35

charged him a penalty that was inappropriate at that time, late in 2006.

A.     I understand that yes.

Q.     Yes.   In this moment it is that you told us before you trusted that with that notification was sufficient to Isaac and that since Isaac was a good employee, well you didn't have to give him further instructions.

A.     Definitely, he enjoyed the support of all management, trust.

Q.     Including yours.

A.     Yes, including mine.

Q.     And that did not change despite that you learned that he was charging a penalty that was not agreed to in the lease contracts?

A.     Definitely for a penalty that he was charging under the approval of Jaime Noble.

Q.     By what you have already told us, the circumstances.   Then, you sent another e-mail on September 21, 2007, about the cancellation balances and you in upper case and bold letters state that they cannot be inflated by double penalty or charges which do not proceed.   Here you already had knowledge also that this situation had occurred?

A.     It is here that, if I am not mistaken, when we are in...

Q.     In the investigation.

A.     ...the investigation.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Q.     And in fact, you warn the employees that violating these instructions could be cause for disciplinary action.

A.     Uh huh.

Q.     And I ask you if the reason why it could be cause for disciplinary action is because that was not agreed to with the clients, to charge them that additional sum.

A.     Yes, that was not agreed to in the contract.

Q.     Therefore, it was an act contrary to the contract itself between Eurolease…

A.     And the client.

Q.     …and the client.  In effect when you investigated it was discovered that Rosa Calo had appropriated the $100,000, the $125,000, you also discovered that the double penalty continued to be charged as of December 2006 when you told Isaac not to charge it?

A.     I cannot, that is, I don't remember right now the date of the checks in particular you know.

Q.     but you remember that the penalty continued to be charged despite your instruction of December 2006?

A.     I am unable to specify.

Q.     You don't know.

PADILLA, ESQ.:

        Let's go off the record for a moment.

                        …Off the record…

                                ,

                        -CERTIFIED-
            To be a correct translation made and/or
                submitted by the interested party

        _____
        Certified Court Interpreter Administrative
              Office of the United States Courts

                                                        37

**EXHIBIT 3**

### SWORN STATEMENT

I, Juan R. Calderon, of legal age, married, General Auditor of Eurobank and resident of Guaynabo, Puerto Rico, state under oath that:

1.    The above are my personal circumstances.

2.    On or about the month of September 2007, Eurobank requested I commence an investigation on certain "balances in excess which were not being returned to the clients," and on "double penalties" which were being charged to clients in their cancellation balances.

3.    As part of said investigation, I interviewed Mr. Luis Maldonado Vaillant, Assistant Vice President Operations Manager.

4.    In his first interview on the matter, Mr. Maldonado denied knowing that a "double penalty" was being charged by personnel under his charge.

5.    Days after being interviewed and in a clear contradiction of his testimony during his first interview, Mr. Maldonado gave me copy of the e-mail he sent in the month of December 2006 asking his subordinates to stop the practice of collecting the "double penalty."

6.    The investigation I performed reflected that Mrs. Rosa Calo, Customer Clerk of Eurobank, appropriated $125,261.82 originating from the "excess of funds in the balances," and from the "double penalty" that was being inappropriately charged to the clients.

7.    The above is the truth according to my best knowledge and I render this Sworn Statement freely and voluntarily.

IN WITNESS WHEREOF, I swear and sign the same in San Juan, Puerto Rico, March 25, 2010.

1

s/
JUAN R. CALDERON

Affidavit No. 69

Sworn to and subscribed before me by Juan R. Calderon, of the aforementioned personal circumstances, and who because I do not personally know him I have identified by his driver's license number 1272933, with a photo and signature of the declarant, issued by the Commonwealth of Puerto Rico.

In San Juan, Puerto Rico, March 25, 2010.


s/ illegible
Notary Public

There appears the seal of the Notary
Public: Jeanette M. Collazo Ortiz
Attorney-Notary


-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

,

2