COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR PART SAN JUAN

| | |
|---|---|
| LUIS R. MALDONADO VAILLANT AND VICKY RODRIGUEZ TORRES, | CIVIL NO.: KPE2008-0872 (502) |
| Plaintiffs, | Re: ALLEGED  WRONGFUL DISMISSAL |
| V | |
| EUROBANK, | |
| Defendant. | |

MOTION TO SUSPEND TRIAL IN CONSIDERATION
OF MOTION FOR SUMMARY JUDGMENT FILED AND
REQUEST FOR ORDER

TO THE HONORABLE COURT:

COMES NOW defendant, **EUROBANK, INC.** (hereinafter Eurobank and/or the Institution and/or the defendant), through the undersigned legal representation and very respectfully states, alleges and prays as follows:

1.  The present case has been scheduled for trial on April 26 and 27, 2010.

2.  **Defendant filed a Motion for Summary Judgment based on the plaintiff's admissions, which establish the existence of legitimate and non-discriminatory reasons for his dismissal, and obviously the existence of just cause, before his lack of supervision.  This shall dispose of the claim without ulterior proceedings.  Said motion is pending adjudication before this Honorable Court.**

3.  Precisely the Supreme Court has recently reiterated that "the **appropriateness of the summary judgment has been recognized in the context of the labor**

claims. *Ramos v Univision*, 2010 TSPR 15;  *Jusino v Walgreens of San Patricio Inc.*, *Santiago v Corco*, 114 D.P.R. 267, 270 (1983);  *Pagan v Fundación Dr. Pila*, 114 D.P.R. 224, 225 (1983); *B.C.R. Medina-Muñoz v R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). This is consistent with the objective of resolving the labor controversies quickly, efficiently and economically.  Besides that "**used in the correct manner, the summary judgment mechanism constitutes an important tool which allows the judges <u>to clean the house of frivolities and decongest the judicial calendars</u>**. *Ramos v Univision*, 2010 TSPR 15.  **In this manner, useless trials are avoided, as well as the expenditure of time and money which this entails for the parties and the court**. R. Hernandez Colon, *Practica Jurídica de Puerto Rico:  Derecho Procesal Civil*, 4th ed., San Juan, LexisNexis, 2007, Sec. 2616, page 240.

4.   On the other hand, defendant learned that both plaintiffs in turn maintain a claim for damages against the Government Development Bank, before the U.S. District Court for the District of Puerto Rico, case *Vicky Rodriguez et al v Government Development Bank*, USDC 09-1151 (JP).  **In view of this, it is important to obtain copy of the <u>testimonies in deposition of the plaintiff in that lawsuit,</u> as they directly have an effect over the alleged "damages" claimed herein.**  To that effect we submit a draft of Order for the consideration of this Honorable Court, which is addressed to **Miguel Cuadros Pesquera, Esq. 701 Ponce de Leon Ave., Suite 215, San Juan, PR 00907,**  who is the legal representative of the plaintiffs in the second lawsuit.

5.  In summary, in consideration of the dispositive motion before the consideration of this Honorable Court, and the need to obtain copy of the testimonies rendered by the plaintiffs in the other lawsuit, which are highly pertinent, we request the postponement of the trial scheduled for which are included the corresponding fees.

6.  This request is made in good faith and not to delay the proceedings.

WHEREFORE, we very respectfully request this honorable Court to: (1) take notice of that stated, (2) issue the order requested to Miguel Cuadros Pesquera, Esq., to provide copy of the testimonies in deposition, of the plaintiffs in the lawsuit of *Vicky Rodriguez et al v Government Development Bank*, USDC 09-1151 (JP); (3) adjudicate the Motion for Summary Judgment; and (4) postpone the trial which could be unnecessary in consideration of the adjudication of the dispositive motion.

RESPECTFULLY SUBMITTED.

I CERTIFY that on this same date I have sent a true and exact copy of this Motion to: Ruben Nigaglioni, Esq., P.O. Box 195384, San Juan, Puerto Rico 00919-5384.

In San Juan, Puerto Rico, April 8, 2010.

FIDDLER GONZALEZ & RODRIGUEZ PSC
P.O. BOX 363507
San Juan, Puerto Rico 00936-3507
Tel. 759-3149
Fax: 250-7565

s/ illegible
CARLOS A. PADILLA VELEZ
Bar membership No. 12,748

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Court Interpreter Administrative
of the United States Courts

3

COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR PART SAN JUAN

| | |
|---|---|
| LUIS R. MALDONADO VAILLANT<br>Plaintiffs,<br><br>V<br><br>EUROBANK, INC.<br><br>Defendant. | CIVIL NO.: KPE2008-0872  (808)<br><br>SPECIAL PROCEEDINGS<br>WRONGFUL DISMISSAL |

CARLOS A. PADILLA VELEZ, ESQ.
FIDDLER GONZALEZ & RODRIGUEZ
P.O. BOX 363507
SAN JUAN, PR                    00936-3507

NOTIFICATION

I CERTIFY THAT IN RELATION TO THE ABOVE CAPTIONED CASE ON APRIL 8, 2010 THE COURT ISSUED THE ORDER WHICH IS TRANSCRIBED BELOW:

ENCLOSURE: ORDER


s/ ISABEL LLOMPART ZENO

Judge

I ALSO CERTIFY THAT ON THIS DATE I SENT BY MAIL COPY OF THIS NOTIFICATION TO THE FOLLOWING PERSONS TO THEIR ADDRESSES INDICATED, HAVING ON THIS SAME DATE FILED IN THER ECORD A COPY OF THIS NOTIFICATION.

RUBEN T. NIGAGLIONI MIGNUCCI, ESQ.,

PO BOX 195384                    SAN JUAN PR
                                 00919-5384

LUIS R. MALDONADO VAILLANT et al
COND SEGOVIA                     APT 1911
SAN JUAN PR                      00918

1

SAN JUAN, PUERTO RICO, APRIL 9, 2010.

REBECCA RIVERA TORRES, ESQ.
CLERK

BY:   S/ ILLEGIBLE
SONIA ORTIZ
DEPUTY CLERK

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

2

COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR PART SAN JUAN

In compliance of Administrative Order No. 313 year 2010, issued by the Honorable Isabel Llompart Zeno, Administrator of the San Juan Judicial Region, the present case has been reassigned to Courtroom 808.

In San Juan, Puerto Rico, April 8, 2010.

REBECCA RIVERA TORRES, ESQ.
REGIONAL CLERK

By:    s/ illegible
Deputy Clerk of the Court

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

?

COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR PART SAN JUAN

LUIS R. MALDONADO VAILLANT
Plaintiffs,

V

EUROBANK, INC.

Defendant.

CIVIL NO.: KPE2008-0872 (808)

SPECIAL PROCEEDINGS
WRONGFUL DISMISSAL

CARLOS A. PADILLA VELEZ, ESQ.
FIDDLER GONZALEZ & RODRIGUEZ
P.O. BOX 363507
SAN JUAN, PR                    00936-3507

NOTIFICATION

I CERTIFY THAT IN RELATION TO THE ABOVE CAPTIONED CASE ON APRIL 8, 2010 THE COURT ISSUED THE ORDER WHICH IS TRANSCRIBED BELOW:

PLAINTIFF IS ORDERED TO EXPRESS ITS POSITION IN A TERM OF FIFTEEN (15) DAYS.

s/ KATHERINE SILVESTRY HERNANDEZ

Judge

I ALSO CERTIFY THAT ON THIS DATE I SENT BY MAIL COPY OF THIS NOTIFICATION TO THE FOLLOWING PERSONS TO THEIR ADDRESSES INDICATED, HAVING ON THIS SAME DATE FILED IN THER ECORD A COPY OF THIS NOTIFICATION.

RUBEN T. NIGAGLIONI MIGNUCCI, ESQ.

PO BOX 195384                    SAN JUAN PR
                                 00919-5384

LUIS R. MALDONADO VAILLANT et al

1

COND SEGOVIA                    APT 1911
SAN JUAN PR                     00918

SAN JUAN, PUERTO RICO, APRIL 9, 2010.

REBECCA RIVERA TORRES, ESQ.
CLERK

BY:    S/ ILLEGIBLE
       SONIA ORTIZ
       DEPUTY CLERK

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

2

COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SUPERIOR PART SAN JUAN

| | |
|---|---|
| LUIS R. MALDONADO VAILLANT<br>Plaintiffs,<br><br>V<br><br>EUROBANK, INC.<br><br>Defendant. | CIVIL NO.: KPE2008-0872  (808)<br><br>SPECIAL PROCEEDINGS<br>WRONGFUL DISMISSAL |

CARLOS A. PADILLA VELEZ, ESQ.
FIDDLER GONZALEZ & RODRIGUEZ
P.O. BOX 363507
SAN JUAN, PR                    00936-3507

NOTIFICATION

I CERTIFY THAT IN RELATION TO THE MOTION FOR POSTPONEMENT OF TRIAL ON APRIL 14, 2010 THE COURT ISSUED THE ORDER WHICH IS TRANSCRIBED BELOW:

SEE ORDER OF APRIL 8, 2010.

PLAINTIFF IS ORDERED TO EXPRESS ITS POSITION IN TEN (10) DAYS.

s/ KATHERYNE SILVESTRY HERNANDEZ

Judge

I ALSO CERTIFY THAT ON THIS DATE I SENT BY MAIL COPY OF THIS NOTIFICATION TO THE FOLLOWING PERSONS TO THEIR ADDRESSES INDICATED, HAVING ON THIS SAME DATE FILED IN THER ECORD A COPY OF THIS NOTIFICATION.

RUBEN T. NIGAGLIONI MIGNUCCI, ESQ.

PO BOX 195384                    SAN JUAN PR
                                 00919-5384

1

LUIS R. MALDONADO VAILLANT et al
COND SEGOVIA                    APT 1911
SAN JUAN PR                     00918

SAN JUAN, PUERTO RICO, APRIL 16, 2010.

REBECCA RIVERA TORRES, ESQ.
CLERK

BY:    S/ ILLEGIBLE
       SONIA ORTIZ
       DEPUTY CLERK

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

2

COMMONWEALTH OF PUERTO RICO
COURT OF FIRST INSTANCE
SAN JUAN JUDICIAL CENTER
SUPERIOR PART

| | |
|---|---|
| LUIS R. MALDONADO VAILLANT AND VICKY RODRIGUEZ TORRES, | CIVIL NO.: |
| | Re: WRONGFUL DISMISSAL -Act No. 80 of May 20, 1976, as amended |
| Plaintiffs, | |
| V | AGE DISCRIMINATION – Act No. 100 of June 30, 1959, as amended |
| EUROBANK, | DAMAGES – Article 1802 |
| Defendant. | |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE COURT:**

**COMES NOW** plaintiff through the undersigned attorney and respectfully states, alleges and prays:

### I. INTRODUCTION

Mr. Luis R. Maldonado worked with Eurobank during a term of approximately seven (7) years. During said term Mr. Maldonado performed satisfactorily in all aspects. Likewise, Mr. Maldonado was never admonished during his employment with defendant.

However, on January 11, 2008, Mr. Maldonado was wrongly dismissed from his employment.

On March 1, 2008 the appearing party filed the above Complaint before this Honorable Court alleging discrimination in employment, wrongful dismissal and damages against Eurobank.

1

On March 28, 2008, Eurobank, through its legal representation filed the Answer to the Complaint. In said answer Eurobank alleged that plaintiff's dismissal was justified so that he does not have the right to the severance pay under Act No. 80 of May 20, 1976 (29 L.P.R.A. 185 *et als)*. Eurobank also alleged that it did not discriminate against plaintiff.

Thereafter, during the month of March 2010, Eurobank's legal representation filed a Motion for Summary Judgment. In said motion, Eurobank alleged that there proceeds this Honorable Court issue summary judgment since there is no real controversy of facts.

After carefully reviewing the motion filed by defendants it is our position that it is incorrect pursuant to the facts, the applicable law and the clearly established case law.

## II. MATERIAL FACTS NOT IN CONTROVERSY

### Unjustified Dismissal

1.     Mr. Luis Maldonado performed satisfactorily while he worked for Eurobank and was promoted. See Transcript of Mr. Maldonado's deposition which is enclosed as *Exhibit I, pages 83 from line 8 to 11.*

2.     Mr. Luis Maldonado was never admonished verbally or in writing by any supervisor of Eurobank. See Transcript of Mr. Maldonado's deposition which is enclosed as *Exhibit I, pages 108 from line 21 to 25.*

3.     Mr. Luis Maldonado was not responsible for reviewing all the transactions related to loan cancellations.   See Transcript of Mr. Maldonado's deposition, page 109 from line 5 to 21.

4.    Mr. Jaime Noble who was Mr. Maldonado's immediate supervisor at no time told him that he should review the situation of the collection of the double penalty. See Transcript of Mr. Maldonado's deposition pages 111 line 6 to 8.

5.    Mr. Luis Maldonado was dismissed for acts committed by his subordinates. See, Transcript of Mr. Maldonado's deposition, pages 58-59 lines 9 to 9 of page 59.

6.    Mr. Jaime Noble knew that Mr. Isaac Fernandez subordinate of Mr. Maldonado was collecting the double penalty for the cancellation of the lease loans. See Transcript of Mr. Maldonado's deposition pages 64-65 line 23 to 24 of page 65. Also see pages 74 from line 5 to 22 of page 75.

7.    Once Mr. Luis Maldonado learned about the practice of the collection of the double penalty realized by Mr. Isaac Fernandez, he notified him that he could not continue with the same. See Transcript of Mr. Maldonado's deposition pages 69-70-71-72 line 11 of page 69 to 22 of page 72.

8.    Mr. Luis Maldonado's dismissal was unjustified since he had not way to control this double penalty charge for cancellation of the lease loan. See Transcript of Mr. Maldonado's deposition pages 95-96-97-98-99 line 8 of page 95 to 10 of page 99.

9.    On September 21, 2007 Maldonado sent to Isaac Fernandez, Rosa Calo and other employees of the Client Services Department an e-mail in which he stated "Effective immediately cancellation balances "**CANNOT BE INFLATED BY DOUBLE PENALTY OR CHARGES WHICH DO NOT PROCEED"** the violation of

3

these instructions may be cause for disciplinary actions. See Stipulation of Uncontroverted Facts #16.

### Discrimination

10.    Mr. Luis Maldonado was submit5ted to a pattern of age discrimination by Eurobank and its employees. See, Transcript of the deposition of Mr. Maldonado page 22 of line 5 to 24, and page 24 of line 2 to 16. Also, see pages 35-36 from line 10 of page 35 to 25 of page 36.

11.    Mr. Jaime Noble, direct supervisor of Mr. Luis Maldonado, discriminated against him by asking him why he didn't consider retirement.   See, Transcript of the deposition of Mr. Maldonado page 25 of Line 1 to 25.

12.    The comments made by Mr. Jaime Noble against Mr. Luis Maldonado were discriminatory.  See Transcript of Mr. Maldonado's deposition page 28 from line 17 to 20.

13.    Mr. Luis Maldonado rejected the discriminatory comments.  See Transcript of Mr. Maldonado's deposition page 37 from line 1 to 25.

14.    Mr. Luis Maldonado and his wife suffered mental anguish as a result of the discriminatory acts and the unjustified dismissal committed by Eurobank. See Transcript of Mr. Maldonado's deposition page 55 from line 9 to 23.  Also see pages 88-89-90-91 from line 6 of page 88 to 23 of page 91.  See from page 93 line 1 up to page 94 line 25.

Inasmuch as there are real controversies over material facts, the appearing party requests this Honorable Court deny the Motion for Summary Judgment filed by the defendants.

4

## III. DISCUSSION

### A.    Appropriateness of the Motion for Summary Judgment

Rule 36 of Civil Procedure enables the Court to discretionally issue summary judgment in favor of a party.  The court may issue summary judgment without the need of holding a trial.  This is so, when from the uncontroverted documents enclosed with the application there does not arise a controversy of fact to be settled and there only remains to apply the law.  *Neca Mortgage Corp. v A&W Developers*, 137 D.P.R. 860 (1995).

Nevertheless, in our judicial system there exists a clear judicial public policy that all cases be heard on the merits due to our interest that all litigants have their day in court.  Therefore, the summary judgment mechanism must only be used when the petitioner has established its right clearly and it has been shown that the other party does not have a right to recover under any circumstances which is discernible from the evidence.

Recently, our Honorable Supreme Court, in the case of *Rivera Rodriguez v Rivera Reyes*, 2006 T.S.P.R. 103 stated the following with regard to the summary judgment:

> "*The summary judgment is the procedural mechanism which grants the trier discretion to issue judgment without the need of holding a trial.  The court, in the exercise of its discretion, may issue it when from the documents admissible in evidence enclosed with the motion for summary judgment or which are in the court record, show there is no legitimate controversy of material and essential facts which need to be settled in a trial and that there only remains to apply the law. Should real controversy exist as to material and essential facts, it must not be issued and any doubt regarding the same must be resolved against the petitioner of the motion, granting the other party the right to a trial. In view of this, the*

5

> summary judgment mechanism must only be used when the petitioner has established its right clearly and it has been shown that the other party does not have the right to recover under any circumstance which is discernible from the evidence. <u>On the other hand, a court, in the sound exercise of its discretion must abstain from resolving by the summary judgment mechanism controversies in which there are underlying subjective elements of intention, mental purposes or negligence, and when the credibility factor is essential.</u>" Emphasis ours.

Likewise, the Supreme Court stated in the case of <u>Lugo Paz v Island X-Ray Inc. v Farinacci Morales</u>, 2006 T.S.P.R. ___:

> Case law is clear by reiterating that when the solution of a controversy depends on the exercise of weighing the credibility of the witnesses, the court cannot dispose of the matter by summary judgment. Moreover, when the controversy revolves around the knowledge of a restriction which did not appear conspicuously in the document as it constituted a matter of fact, it is improper to issue summary judgment. In these cases a trial must be held.
>
> Relevant to the case at bar, in <u>Soto v Hotel Caribe Hilton</u>, 137 D.P.R.. 294, 301 (1994), the Supreme Court resolved that it is not recommendable to use the procedural mechanism of summary judgment in cases where the credibility factor plays an essential role, if not decisive, to get to the truth, or when the litigant depends in great measure on what it extracts from the other party during the trial.

Upon Interpreting Rule 36.3 of Civil Procedure, 32 L.P.R.A. Ap. III, R. 36.3 (2001), which regulates summary judgments, the Supreme Court has required the Courts of Instance to be moderate in their use and we have indicate that they must only do so when they are fully convinced that there are no controversies on the facts of the case, and that there only remains to apply to the law. In order to have this certainty as to the inexistence of controversy of facts, the Courts of Instance must consider all the documents with are in the file, by they part or not of the motion for summary judgment

6

or its opposition. See Vera Morales v Bravo Colon, *supra*; Jusino et al v Walgreens, 151 D.P.R. 560 (2001); Cuadrado Lugo v Santiago Rodriguez, 126 D.P.R. 272 (1990).

The text of Rule 36.3 of Civil Procedure and the statements of the Supreme Court in the past on this matter show that the Court of Instance cannot issue summary judgment when there are material and essential facts in controversy; when there are affirmative allegations in the Complaint which have not been refuted; there arises from the documents enclosed with the motion that there is a real controversy on any material and essential fact; or that as a matter of law the petition does not proceed. Vera Morales v Bravo Colon, *supra*; Luan Invest. v Rexach Const. Co., 152 D.P.R. 562 (2000).

The Supreme Court requires of the courts of first instance prudence and restraint in the use of that procedural haste and has urged them to exercise their discretion responsibly and informed. The court shall not issue summary judgment when : (1) there are controverted material and essential facts; (2) there are affirmative allegations in the complaint which have not been refuted; (3) there arises from the documents that are enclosed with the motion, a real controversy over any material and essential fact; or (4) as a mater of law it does not proceed." Vera Morales v Bravo Colon, 2004 J.T.S. 40, at page 750.

Finally, if there are doubts as to the existence of a controversy of facts, the motion for summary judgment must be resolved against the party who requests the summary judgment. In this manner, this prevents stripping one of the parties of their right to having their day in court, one of the elementary principles of the due process of law. Velez Lebron v Garcia Passalacqua, 2004 T.S.P.R. 169.

Summary judgment must only be issued "in clear cases when the court has before it the truth about all the pertinent facts." Medina Morales v Merck Sharp & Dohme, 135 D.P.R. 716 (1994) (Emphasis ours). A court may issue summary judgment when there is no real substantial controversy as to any material fact, provided it proceeds according to law. Pilot Life Ins. Co. v Crespo Martinez, 136 D.P.R. 624 (1994); Rodriguez Lugo v Secretario de Hacienda, 135 D.P.R. 219 (1994); Perez Sanchez v Admisor Mortgage Investors, 130 D.P.R. 530 (1992); Tello Rivera v Eastern Airlines, 119 D.P.R. 83, 87 (1987). That is, the court must be convinced of the inexistence of controversy of material facts and that the only thing remaining is to apply the law. See, PFZ Properties Inc. v General Accident Insurance Co., 136 D.P.R. 881 (1994); Roig Commercial Bank v Rosario Cirino, 126 D.P.R. 613 (1990).

The determination of what or which is a material fact depends on the substantive law applicable. Only those controversies on facts which may affect the solution of the case, pursuant to applicable substantive rules prevent that summary judgment be issued. Anderson v Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Gris-Ryan v Smith, 904 F.2d 112 (1st Cir. 1990); Brennan v Hendrian, 888 F.2d 189 (1st cir. 1989).

With these parameters in mind let us consider the appropriateness of the Motion for Summary Judgment in light of the facts of the case and the applicable law.

### B.   Act No. 80 of May 30, 1976

Act No. 80, *supra*, does not purport to be a code of conduct containing a limitative list of clearly define faults, nor of the sanctions corresponding to each fault committ6ed. See Jusino Figueroa v Walgreens of San Patricio, *supra*, at page 6; Secretario del Trabajo v. I.T.T., 108 D.P.R. 536, 542 (1979). Due to this, the employer

has the authority to adopt reasonable regulations in order to obtain the good operation of the company. *Id*. Now, then, in any event, for the violations of the work standards to constitute "just cause" for dismissal, the employer must prove the reasonability of the rules established, that it provided a written copy of these to the employee, and that the employee violated them. Jusino Figueroa v Walgreens of San Patricio, *supra*; Rivera Aguila v K-Mart de Puerto Rico, 123 D.P.R. 599 (1989). Also, Article 8 of Act No. 80, 29 L.P.R.A. §185k, creates a presumption that the dismissal of the employee was wrongful; that is, in an action for wrongful dismissal, the employer has the burden of proof to establish that the dismissal was justified. Diaz Fontanez v Wyndham Hotel Corp., *supra*., at page 16; Belk Arce v Martinez, *supra*; Secretario del Trabajo v I.T.T., *supra*.

In view that within an employment contract, the rules manual approved by the employer is an integral part of said contract, the respondent was entitled that these factors be taken into account at the time of evaluating its dismissal. See Santiago v Kodak Caribbean, 129 D.P.R. 763 (1992); Charles Zeno Santiago v Victor M. Bermudez, Tratado de Derecho del Trabajo, Book I, at page 109 (Pubs. J.T.S. 2003).

Now then, addressing the important public policy in favor of the workers, such exigencies, requirements and sanctions must be reasonable and above all clear and detailed, so that the worker may keep in mind what its duties are, as well as the consequences for its non compliance. See Delgado Zayas v Hospital Interamericano.

The Supreme Court of Puerto Rico has established the bases for the interpretation of Act No. 80 in several ruling cases which we shall discuss in this section. The court emphasizes several criteria to be considered when the employer decides to dismiss a worker. These are:

i)      The dismissal cannot be capricious.

ii)     The just cause is only that reason linked to the good and
        normal operation of the company.

iii)    While the employee complies with its obligations and does
        not damage the employer's interests, then there is no just
        cause for its dismissal.

In the case at bar, Mr. Maldonado worked with Eurobank for approximately seven (7) years). During said term Mr. Maldonado worked satisfactorily in all his facets. Likewise, Mr. Maldonado was never admonished.

However, on January 11, 2008, Mr. Maldonado was dismissed from his employment for his alleged inefficiency by not adequately supervising his subordinates.

Mr. Maldonado's dismissal was wrongful since it does not comply with that provided by Act No. 80 of May 20, 1976, as amended on October 7, 2005.

## C.    Age Discrimination:  Act No. 100

The Constitution of Puerto Rico in its Bill of Rights reads that "the dignity of the human being is inviolable" and that "there shall be no discrimination by reason of race, color, sex, birth, origin or social condition, or political or religious ideals." 1 L. P.R.A. Art. II §1. In this manner, our Constitution orders the construction of a judicial system which promotes the equality of the individuals before the law.

On its part, Article II, Section 16 of our Legislative Assembly has made feasible and reiterated these principles of justice in our legal system. In this manner, in the labor scope several statutes have been enacted to proscribe age discrimination. Because work is frequently the support to obtain articles and indispensable services of

10

daily life, the State has a compelling interest to "regulate the labor relations, of avoiding unjust labor practices and the existence, in our jurisdiction of a clear public policy of protecting the rights of the workers." *Diaz v Wyndham Hotel Corp.*, 155 D.P.R. 364, 374 (2001).

Act No. 100 of June 30, 1959, as amended, prohibits the dismissal or unequal treatment in working conditions against an employee by reason of its age. 29 L.P.R.A. §§146 *et seq.* Said law specifically provides that age discrimination shall be illegal and subject to indemnity "in relation to its salary, wage, pay or remuneration... ." 29 L.P.R.A. §146.

Act No. 100, *supra*, provides that a dismissal or an adverse personnel action realized without just cause shall be presumed discriminatory and in violation of law. This presumption is of a controvertible character. 29 L.P.R.A. §148. The effect of the presumption indicated makes it necessary to resort to the Rules of Evidence:

> In a civil action, **a presumption imposes on the party against whom it is directed the burden of proving the nonexistence of the presumed fact.** If the party against whom the presumption is established fails to offer evidence showing the nonexistence of the presumed fact, the trier shall accept the existence of said fact. If evidence is introduced in support of a determination as to the non-existence of said fact, the party wishing to rebut the presumption shall persuade the trier that nonexistence of the presumed fact is more likely than its existence.

32 L.P.R.A. Ap. IV, R. 14 (emphasis ours).

This rule of evidence transfers the burden of proof from one party in the lawsuit to the other. In other words, defendant is'obligated to prove the nonoccurrence of the fact by preponderance of the evidence, that is, prove that nonoccurrence of the fact presumed is more probable than its occurrence. *Ibañez v Molinos de Puerto Rico,* 114

11

D.P.R. 42 (1983).  The presumption expressed is activated when it is proven that the employer did not have just cause to take the adverse personnel action, in our case the absence of rational grounds to set the salary and later dismissal of plaintiff.  Now then, Act NO. 100, *supra*, does not define the term "just cause," so that the Supreme Court has indicated that it is necessary to resort to the definition provided for said concept by the Wrongful Dismissal Act, Act No. 80 of May 30, 1976, 29 L.P.R.A. §185b.  *Alberty v Banco Gubernamental de Fomento*, 149 D.P.R. 65, 61-662 (1999).

In the federal sphere and under Title VII, the Civil Rights Act of 1964, 42 U.S.C. §§1981-2000h-6, as amended, has provided a scheme to regulate the evidentiary turns in this type of actions.  With some similarity, in our jurisdiction and under Act No. 100, *supra*, a presumption of discrimination is specifically provided.  *Diaz v Wyndham Hotel Corp.*, *supra*, the procedural scheme of the presumption provided in Article 3 of Act No. 100 is the following:

> (i)      The employee must present evidence, first, that there was a dismissal or prejudicial act; second, that the act was realized without just cause; and third, any fact which places it within the modality of discrimination under which it claims.      Once the employee complies with this first procedural stage, the presumption of discrimination of Art. 3 arises, without it having to prove the discriminatory act directly.      In this stage, the burden of proof changes and falls on the employer.  If the employer does not present sufficient evidence to rebut the presumption, it shall be understood that the employee has proven its case.

> (ii)     To defend itself and thus rebut this presumption, the employer has several alternatives.  It may present evidence which defeats the basic fact, that is, that the dismissal was justified; or destroy the presumed fact (that the dismissal was not discriminatory); or present evidence to attack both facts.

>    (iii)    Once the employer rebuts the presumption of
>    discrimination and only in this event, the worker may
>    continue its case without the evidentiary benefit of the
>    presumption. That is, present concrete evidence that proves
>    discrimination really existed.

*Díaz v Wyndham Hotel Corp., supra; Hernandez V. T.O.L.I.C.*, 151 D.P.R. 754 (2000);

*Alberty v Banco Gubernamental de Fomento, supra*.

A complaint for discrimination under Act No. 100 granted, the worker has the right to be compensated for the damages consequent of the illegal acts of its employer with the penalty provided by law. Said law provides for the employer who is liable for the discrimination proscribed responds civilly for a sum equal to twice the amount of the damages sustained by the employee on account of such action. 29 L.P.R.A. §146. The repairing scheme of this postulate, in protection of the workers, purports to provide the victims of discrimination in employment with the necessary instruments so that the damages caused are repaired. This cause of remedial action includes the repair "**of all the damages suffered**, both the economic damages as well as the suffering and mental anguish." *S.L.G. Afanador v Roger Electric Co., Inc.*, 156 D.P.R. 651, 667 (2002).

The imposition of adequate compensation for the repair of damages is fundamental to once again reestablish the legal order. J. Santos Briz, LA RESPONSABILIDAD CIVIL, 2d ed., page 259 (Madrid, Ed. Montecorvo, 1977). The doctrine suggests that "all the damage originated to the injured party is to be indemnified for the incident generator of liability to the one causing the damage." M. Albaladejo, commented by J. Santos Briz and A. Gullon Ballesteros, COMENTARIOS

AL CODIGO CIVIL Y COMPILACIONES FORALES, Book XXIV, page 161 (Madrid, Ed. Edersa, 1984).

At times, the Supreme Court has resolved the appropriateness of certain items which may be adjudicated in favor of the employee in a lawsuit for discrimination. Among these are the moral damages or for suffering and mental anguish in addition to the patrimonial damages. Our case law makes no distinction between physical, mental or moral damages for purposes of the compensation. *Garcia v Shiley Caribbean*, 122 D.P.R. 193, 205 (1988); *Correa v Autoridad de Fuentes Fluviales*, 83 D.P.R. 144, 153 (1961); *Hernandez v Fournier*, 80 D.P.R. 93, 97 (1957). Pursuant to this principle the Supreme Court has expressed that damage is all that moral or material damage suffered by a person "be it in its vital natural assets, be it in its property or in its patrimony, caused in contravention of a rule of law and for which another is liable. *Garcia v Shiley Caribbean, supra*, pages 205-206. Consistently, our legal system promotes a full system of repair in the area of damages which pursues to take the injured party by a legal action to its prior condition, as possible.

The patrimonial damages in this type of action include the economic loss according to the income and benefits which a plaintiff stopped receiving. An item has been recognized to compensate the monies not earned, these are the income not earned from the date of the dismissal until the date of the judgment and better known as *back pay*. Also, within the patrimonial damages which may be granted is the loss of future income or *front pay*. *S.L.G. Afanador v Roger Electric Co., Inc., supra; Odriozola v S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985); *Lopez v ITT Intermedia, Inc.*, 142 D.P.R. 857 (1997). Although the Supreme Court has reiterated that the preferred

remedy in dismissal cases is the reinstatement in employment, this option shall proceed when at the discretion of the court it is possible, limiting thus the patrimonial damages to the granting of back pay.

Under federal legislation, as well as in Puerto Rico, the remedies of *back pay* and *front pay* have been recognized. The back pay compensates the plaintiff for the loss of income from the dismissal until the judgment, while the front pay is a compensation for the loss of income from the judgment onward. *See e.g. Johnson v Spencer Press of Main, Inc.,* 364 F.3d 368 (1st Cir. 2004). These two remedies together with the granting of compensation for moral damages have the finality of placing the injured party in a situation similar to the one it was in just before the illegal action. The Supreme Court has resolved that, the same as its federal counterpart, Act No. 100, *supra*, grants the right to compensation for front pay in cases in which the reinstatement of the employee to his position cannot be decreed. *Odriozola v S. Cosmetic Dist. Corp.*, *supra*, pages 509-510.

On its part, the moral damages are considered non-economic or non-patrimonial damages because their adjudication is not based on an economic or exact equivalency, but do not cease to be compensable in money. *Garcia v Shiley Caribbean, supra.* The certain degree of speculation has been recognized which entails the valuation of the damages, task which becomes delicate and exacting for the trier. To such effect, our case law has suggested the discretion of the trier using the sense of justice and human conscience in its determination. *S.L.G. Rodriguez v Nationwide*, 156 D.P.R. 614 (2002); *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975). In the estimation of the damages, the courts

of instance are in a better position than the courts of appeal due to their direct contact with the evidence. *Rodriguez v. A.E.E.*, 116 D.P.R. 443 (1985).

The repairing function of Act No. 100, *supra*, orders the full repair of all the damages suffered by the injured party as a result of a discrimination of those therein proscribed. Santos Briz states that to value a damage one must take into account the notion of the "interest," where "the damage is determined by an operation of calculation, compared to the real situation of the patrimony after the damaging event and **the imaginary condition it would present if it had not occurred**. The resulting difference indicates the existence of the damage and its amount." J. Santos Briz, *op. cit.*, at page 127 (emphasis ours).

In the present case, Mr. Maldonado was submitted to a pattern of discrimination by reason of age by Eurobank and its employees. Specifically, Mr. Jaime Noble, direct supervisor of Mr. Luis Maldonado, discriminated against him to ask him why he did not consider retiring.

Also, Eurobank used as a pretext the acts committed by third parties to dismiss Mr. Maldonado. Therefore, pursuant to the above it is evident to conclude that Eurobank discriminated against Mr. Maldonado.

The Motion for Summary Judgment filed by the defendants does not proceed since plaintiff has sufficient evidence to establish a *prima facie* case of age discrimination pursuant to that resolved in *Lopez v Miranda, supra*.

The deposition of Mr. Maldonado clearly established the existence of: (1) a damaging act (the dismissal); (2) the absence of just cause for such action and (3) a fact which places the person within the modality of **discrimination proscribed (**Mr.

16

Maldonado's **age**). This evidence is sufficient to comply with the evidentiary burden in the first procedural phase of a claim for discrimination.

Before a *prima facie* case of discrimination, such as the one above, the employer, Eurobank must rebut the presumption establishing at least one of two things: (1) that the dismissal was justified or (2) that the dismissal was not discriminatory. In the present case, Eurobank did not comply with its burden of proof.

With the evidence presented by Eurobank it did not defeat the *prima facie* presumption of discrimination, since it did not uncontrovertibly establish that Mr. Maldonado was justifiably dismissed without discrimination.

The evidence presented by the appearing party is detailed and sufficient evidence to create a substantial controversy of relevant and essential facts. See *Quest Diagnostic v Mun. San Juan, supra; Lopez v Miranda, supra; Luan Invest. Corp. v Rexact Const. Co., supra*.

Finally, since Mr. Maldonado's dismissal was wrongful and discriminatory, there proceeds the indemnity for damages as arises from Act No. 100. Additionally, plaintiffs suffered mental anguish for the discriminatory acts and the wrongful dismissal made by Eurobank.

Pursuant to the above and analyzing the controversies of facts raised by the appearing party, it is necessary that this Honorable Court deny the Motion for Summary Judgment filed by defendant.

WHEREFORE, the appearing party respectfully requests this Honorable Court that, due to the fact that controversies exist on material facts in the above captioned

case, and pursuant to that provided by law, it proceed to Deny the Motion for Summary Judgment filed by defendants.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, April 21, 2010.

I CERTIFY that on this same date a true copy of this motion has been sent to Carlos A. Padilla Velez, Esq., Fiddler Gonzalez & Rodriguez, P.O. Box 363507, San Juan, PR 00936-3507.

> NIGAGLIONI & FERRAIUOLI LAW OFFICES, P.S.C.
> Attorneys for plaintiff
> P.O. Box 195384
> San Juan, Puerto Rico 00919-5384
> Tel. (787) 765-9966
> Telefax:  (787) 751-2520
>
> s/ illegible
>
> Ruben T. Nigaglioni
> RUA 3,145
> ruben@nf-legal.com

-CERTIFIED-
To be a correct translation made and/or submitted by the interested party

Certified Court Interpreter Administrative Office of the United States Courts

?

**Exhibit 1**

Page 22

A.     Yes, sir.

Q.     When was the last time you read it?

A.     In recent days.

Q.     In recent days.  In the claim that you make, you allege in your paragraph 8 that you were discriminated against by reason of your age.  You allege that that you were discriminated against by reason of your age.

A.     That is correct.

Q.     What did that alleged discrimination that you are claiming consist of?

A.     Comments regarding my age.

Q.     Comments regarding your age.  On what else?

A.     That type of…

Q.     Only comments about your age.

A.     Comments.

Q.     What type of comments were made to you regarding your age?

A.     Well, they called me the old man.  In situations where personnel from other areas were present well it could be in my office and as I say, once, well one understands it is witty, but when it is continuous, well it goes from something witty to becoming a nuisance.

Q.     Besides that remark of old man, any other?

A.     No, nothing else.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

_____
Certified Court Interpreter Administrative
Office of the United States Courts

1

A.    No, sir.

Q.    Who made that remark?

A.    The part of the "old man" the remarks came from the sales area, certain sales executives and some dealers, that is, from a dealer precisely.

Q.    That is, you told me that this comment was made by account executives and dealers.  Anyone else?

A.    Of "old man" those persons.

Q.    Yes, I asked you before if there was any other remark besides that of the "old man," you said no.

A.    Okay.

Q.    Am I clear?

A.    You are clear.

Q.    Or is there any other remark?

A.    No, there is no remark as to "old man," but yes inducing to retirement.

Q.    Let's go back then.  Your allegation of discrimination by reason of age you tell me is based on certain remarks which you perceived were discriminatory.

A.    Correct.

Q.    And the first is the one they called you "old man."

A.    Correct.

Q.    Any other remark?

A.    During the period from December to January...

Q.    Of what year?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

2

A.     December of 2007 and January 2008.  Mr. Jaime Noble in official meetings we held, on two or three occasions approached me to tell me why I didn't consider retirement.  The first time he made the approach I told him clearly "I expect to work three or four more years because I need to repay some debts I have."

Q.     You thought to work three or four more years.

A.     Correct.

Q.     And you say that it was Mr. Noble who made that approach as to when you were going to retire.

A.     Right.

Q.     Any other comment?

A.     No.

Q.     That comment of Mr. Noble was on that occasion?

A.     Several occasions.

Q.     On how many occasions?

A.     About on three or four occasions?

Q.     Can you specify the specific circumstances of those occasions?

A.     No, because they are situations where I went to his office to discuss official matters and between one thing and another well at the end of the conversation the matter of the retirement came out.

Q.     Should I understand that these conversations occurred only between you and Mr. Noble.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter, Administrative
Office of the United States Courts

3

A.     Very rarely.

Q.     But you partook?

A.     At some time.

Q.     Social activity?

A.     Yes, social of the bank.

Q.     He was your immediate supervisor, no?

A.     That is correct.

Q.     Did that remark bother you?

A.     Definitely.

Q.     Did you tell Mr. Noble?

A.     When he told me I answered, "I am going to work four more years, three or four years, and that's it."

Q.     What I want to ask is if you told Mr. Noble that the remark bothered you.

A.     No, I did not tell him.

Q.     Did you perceive that remark as discriminatory?

A.     I understand it was, because if I am in condition to work I don't see why they have to suggest I retire.

Q.     Did you suggest to anyone at any time to retire?

A.     Negative.

Q.     If you feel discriminated, why didn't you go to the Human Resources Department?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Q.      And when one had to talk about work you talked…

A.      I went to his office.

Q.      …in his office.  In yours also or not?

A.      Principally in his office which had a table available for that.

Q.      And in those six years that you worked for Eurobank Mr. Noble was always your immediate supervisor?

A.      That is correct.

Q.      Let's go to the remark about the "old man."  You say that those remarks were made by the sales personnel.

A.      Uh huh.

Q.      Who made those remarks to you?

A.      Mr. Joaquin Pineda.

Q.      Joaquin Pineda.

Q.      Uh huh.  Who was a Sales Executive.

A.      Who else?

Q.      And Marcos Solis.

A.      Marcos Solis.  He was also a sales executive?

Q.      That is correct.

A.      And when did those remarks occur?

Q.      Situations that they came to the office or we were in the lunch or we were in the group of the work area, the Quality Area.

Q.      In what years did those remarks occur?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

5

A.    2007 or 2006.

Q.    Do you know the months?

A.    Negative.

Q.    And what did they tell you?

A.    Well, "I am coming to the old man to resolve this for me."

Q.    "I am coming to the old man to…"?

A.    To resolve this for me.  Or what the old man doesn't know no one knows.

Q.    Any other remark aside form those two you have mentioned…

A.    Practically…

Q.    …aside from those two gentlemen, Joaquin Pineda and Marcos Solis?

A.    Practically that was the phrasing.

Q.    And those persons who did they report to?

A.    They first reported to… well, they reported to Juan Carlos Wolf.

Q.    Juan Carlos Wolf.  And Juan Carlos Wolf was one of the managers.

A.    He was the Sales Manager.

Q.    Of Eurolease, right?  They were hierarchically at your same level?

A.    Correct.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Q.      And you called the attention of these persons, to Joaquin Pineda and to Marcos Solis?

A.      A couple of things that arose the situation, and I told them "Stop that joke."  But they insisted.

Q.      It was a joke they did   towards you?

A.      I cannot say it was a joke, that is, I told him that particular.

Q.      Why did you use that word joke?

A.      Because I believe that it is a remark that...

Q.      You perceived it as a joke?

A.      Not necessarily.  That is, a simply discriminatory remark.

Q.      And why do you catalogue it as a joke?

A.      No, because it is a remark, as I say, that is not usual, it is not the usual remark between a superior and another person.

Q.      To you it was a joke.

A.      Not necessarily.

Q.      And what did they say when you told them "Stop that joke."

A.      They laughed.

Q.      And you said that in the beginning you perceived that remark as something funny.

A.      As funny?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Q.     Should I understand that these remarks that you have made, as you told me before, are those which you allege occurred and on which you base to make your claim for age discrimination?

A.     That is correct.

Q.     Listen and you say that this discrimination has caused you economic damages.

A.     That is correct.

Q.     What do those damages consist of that you impute to that conduct which you catalogue as discriminatory?

A.     Well, I lost my job.

Q.     Pardon me.

A.     I lost my job.

Q.     You lost your job.  What else?  What other damage do you impute to that type of conduct?

A.     Well, they are damages which have affected my reputation by being dismissed and where people questioned how the dismissal occurred.

Q.     You said you lost your job and reputation by being dismissed and that the people questioned how the dismissal occurred.

A.     Yes, and my health condition was affected.  That never in my life had I gone to a psychiatrist.  At my age looking for a job is highly difficult due to the matter of the age.

Q.     Why due to the age, Mr. Maldonado?

A.     Well, definitely, that is, a person of the age

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

8

Page 58

definitely involve all this part of the remarks they started to make and the effect after I was left without a job.

Q.    You tell me that you blame the loss of your job in part on those remarks  and another situation which occurred in the workplace?

A.    That is correct.

Q.    What was that other situation that occurred in the workplace?

A.    The misappropriation of an employee.

Q.    Who was that employee?

A.    What?

Q.    Who was that employee?

A.    Rosa Calo.

Q.    Rosa Calo.  She was the one you mentioned was…

A.    In Client Service.

Q.    …in the Client Service Area under the supervision of Isaac Fernandez and in turn under your supervision.

A.    And under my supervision.

Q.    What happened with that lady?

A.    Well, she availed herself…she appropriated several checks which belonged to certain clients and negotiated them fraudulently together with another person from Banco Popular.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

9

Q.      She appropriated checks of clients and negotiated them with another person of Banco Popular.

A.      Uh huh.

Q.      What amount are we talking about?

A.      They are several checks. She took several checks.

Q.      You don't know the amount?

A.      I understand that about $100,000 or $125,000 about there.

Q.      From $100,000 to $125,000.

A.      To $125,000.

Q.      And for what reason where those checks issued?}

A.      They were surpluses that had to be reimbursed to the clients.

Q.      And from where did that surplus originate?

A.      From the cancellations.  From cancellations of lease contracts.

Q.      What was the procedure for a cancellation of a lease contract?

A.      Well, give a letter to the client with the balance to be cancelled and from there pass it to the Accounting Department for the liquidation.

Q.      And those checks that you have indicated, that you say she appropriated, it was for the cancellation of lease contracts?

A.      Cancellation surpluses.

Q.      Why was there a surplus?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

10

Page 64

A.     That was while it was a Kennedy, I don't remember the exact year.

Q.     What did Mr. Fernandez inform you at that time?

A.     He told me "We are going to apply two penalties so that we can collect the penalty corresponding to us and we return the excess to the client."

Q.     We are going to apply two penalties to collect what corresponds to us and return the excess.

A.     Exactly.

Q.     But why the charge for the one which corresponds if that was already contained in the original contract, why did a second one need to be applied?

A.     Because there is a portfolio, as I say, a portfolio which is administered and normally the clients were "prime" clients and when you are going to charge them a penalty the first thing they say is, but if I have good credit why are you going to charge me that.

Q.     Even when it was contained in the lease contract?

A.     Even if it was contained in the contract.

Q.     And when was that second penalty charged to the client?

A.     At the time of the cancellation.

Q.     And you say that Mr. Fernandez told you that while at Kennedy.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

11

A.     While at Kennedy.  When he told me, that I said "That cannot be done," he left my office and he went to the office of Jaime Noble.

Q.     What happened then?

A.     As soon as he left Jaime's office, he went by my office and told me "The Chief Commander knows about the penalty."

Q.     "The Chief commander…

A.     "Knows about the penalty."

Q.     …knows about the penalty."

A.     Uh huh.

Q.     And he did not mention which penalty, if it was the one in the contract or the second one?

A.     No, no, the second penalty, because the one of the contract is obvious.

Q.     But he told you he knows about the penalty.

A.     Exactly.  He went into Noble's office because I rejected the request for a double penalty.

Q.     But he did not specify which penalty?

A.     To who?

Q.     To you.

A.     No, because he does not have…the other is logic the other is by the contract.

Q.     You said that one is logic, he did not explain about which penalty he was talking about.

A.     No, he did not.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Comptroller what it understood there was with this case.  And an audit was performed.

Q.    Who was the comptroller?

A.    Angel Rivera.  And then there was performed a…

Q.    Excuse me, Angel Rivera wasn't he the same one who had investigated?

A.    Yes, Angel Rivera who is the comptroller with his assistant.

Q.    With his assistant.

A.    That are members of the Eurolease staff.

Q.    That is, that when you refer the matter to Angel Rivera, he already knew what…

A.    No, no, he didn't know.  He investigated when we took to him the perception of what we have.

Q.    That is where I get lost.  In that initial stage…

A.    The situation arose.

Q.    …the situation arose with the client.

A.    When that arose, we found a pattern of an account that coincidentally gave the reference of a personal account of Isaac Fernandez on the back of a check.  I told Isaac "Let's verify this a bit further."  And more or less, about 30 days of reimbursement were taken and we saw that the same pattern was occurring, the same endorsements…

Q.    Who made that initial effort?

A.    That was done by Isaac Fernandez.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Q.    You did not participate there?

A.    That is, I do not participate in the matter of looking for copies, but I did in verifying the cases.

Q.    And you verified them when Isaac Fernandez brought them to you?

A.    When he brought them here. And then when we already have a picture that this is a situation…a pattern, then we called the Comptroller and told him look there is this, let's investigate this in more detail, and that is when he comes in with his assistant and they check all the cases from a date towards the present, which I don't recall the specific date.  Once the Comptroller has all the cases as we say, investigated, then Auditing or top management was notified, I don't know, because Angel does that directly.

Q.    Until that time, had Mr. Rivera mentioned to you what the findings were or not?

A.    Yes, no, definitely, he came and told me, that the checks had been fraudulently negotiated.

Q.    That was what Mr. Rivera told you?

A.    Uh huh.

Q.    And then you tell me that Mr. Rivera referred it to…

A.    He referred it to management, to someone in management or to the auditors directly.  I am unable to say there.

Q.    Did you intervene in that phase?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

14

A.    No, I do not intervene directly in their report until the auditors come.

Q.    Were you interviewed?

A.    Yes.

Q.    Who interviewed you?

A.    The supervisor of the auditors?

Q.    Do you remember the name?

A.    Negative.

Q.    Do you remember if it was Mr. Juan Calderon?

A.    That is correct.

Q.    How many times did you meet with Juan Calderon?

A.    I believe twice.

Q.    Twice. And what was the purpose of those meetings?

A.    Well, the purpose was investigating what had been done in the office.

Q.    In the department that you directed.

A.    Yes, in Eurolease.

Q.    Do you remember what they asked you?

A.    No, sir.

Q.    You don't remember.  Do you remember what you told Mr. Calderon at that time?

A.    No, because I don't remember what he asked me.

Q.    Neither what you told him?

A.    Negative.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

15

Q.     Do you remember if he asked you about the double penalty?

A.     I am unable to be precise.

Q.     Listen, after that meeting that you no longer remember what they asked you, nor what you said, what happened?

A.     They, the auditors came, they made their…the same work we had done to make sure that the information we were providing them was correct.

Q.     Do you know what conclusion they arrived at?

A.     What conclusion?

Q.     Yes.

A.     Definitely that there was a misappropriation.

Q.     Listen, once you say that in December 2006 you told Isaac Fernandez to discontinue the practice of charging a double penalty.

A.     Uh huh.

Q.     Should I understand that when you sent him that communication it was because you knew that this gentleman was incurring in that practice?

A.     Well, the claim made by the Sales Executive about the change in the cancellation balance shows that.

Q.     But that…that happened about that same date.

A.     About that date, that is why the communication arises.

Q.     And you as supervisor of Isaac Fernandez, what disciplinary action did you take against Isaac Fernandez when you learned that Isaac was charging that double penalty?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

16

Q.    Despite the fact that what he was doing was contrary to the contract, this did not vary your perception of Isaac?

A.    But that situation…

Q.    But did the impression you had of Isaac vary when you learned that Isaac was charging the double penalty?

A.    Well, I mention again.  The double penalty has the connotation of approval from Jaime Noble.

Q.    That is what you deduce from the remark which Isaac Fernandez you allege made to you?

A.    Yes, definitely.

Q.    Listen, did you at any time talk with Mr. Jaime Noble about that situation?

A.    I believe so.

Q.    When?

A.    I don't remember.

Q.    What do you remember having talked with Mr. Noble about that situation?

A.    I believe that it was the matter of double penalty, but I don't know, I am unable to specify when.

Q.    Nor can you precise what you talked about?

A.    No.

Q.    When Isaac Fernandez mentions that to you, as you mention, having come out of the office of Mr.

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

17

Noble, you didn't immediately go to Mr. Noble's office to discuss that matter?

A.    Negative.

Q.    No.

A.    That is the use and custom of Noble in making his decisions and if one finds out,

one finds out.  If one finds out, one finds out.

Q.    But you as person in charge of the area, supervisor of Isaac Fernandez who was

in turn Rosa Calo's supervisor, you didn't go to Jaime Noble to discuss that matter?

A.    No, because I had no reason to discuss it, if Noble approves it, he approves it.

Q.    Excuse me.

A.    If Noble had already approved it, it was a matter that I could not go over him.

Q.    At that time you didn't know if Noble had approved it or not?

A.    Well, if Isaac Fernandez goes to my office to request my consent for the double

penalty and I tell him no and he goes to Noble and when he comes out he tells me "The

Chief Commander knows about the penalty."

Q.    That is sufficient for you.

A.    Yes, definitely.

Q.    You didn't confirm it with Mr. Noble?

A.    No, I did not confirm it with Noble.

Q.    Despite that you knew that was contrary to certain

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts

Q.    I ask you if you were explained that it was in regard to the matter of the double penalty and the appropriation which had occurred in the department that you directed.

A.    Perhaps, I cannot precise but it is possible that they mentioned it.

Q.    Did you make any remark to Mrs. Mendez in that meeting?

A.    Yes, if I recall when she told me that I had been inefficient, well I questioned her why then had they promoted me in July to Assistant Vice President, how is it possible that now they were saying that I was inefficient in my functions.

Q.    Anything else you questioned Mrs. Mendez about at that time?

A.    I don't remember.

Q.    the truth is that on the date you were promoted to Assistant Vice President, you tell us it was in July 2007, that situation of the audit had not been discovered or investigated?

A.    Uh huh.

Q.    And at that time you didn't mention to Mrs. Aida Mendez the alleged comments of Mr. Noble or other co-workers towards you?

A.    I don't recall.

Q.    Do you know what other persons were dismissed that same day as you?

-CERTIFIED-
To be a correct translation made and/or
submitted by the interested party

Certified Court Interpreter Administrative
Office of the United States Courts